**PLOWMAN et al. v. INDIAN REFINING CO.**

No. 837–D.

District Court, E. D. Illinois.

Aug. 19, 1937.

Sumner & Lewis, of Lawrenceville, Ill., and Acton, Acton & Baldwin, of Danville, Ill., for plaintiffs.

Walter T. Gunn, of Danville, Ill., Fred W. Gee, of Lawrenceville, Ill., and James T. Nielsen, of Chicago, Ill., for defendant.

LINDLEY, District Judge.

Thirteen persons and the administrators of five deceased persons brought this suit, alleging that defendant, in 1930, made separate contracts to pay each of the individual plaintiffs and each of the deceased persons whose administrators sued, monthly sums equal to one-half of the wages formerly earned by such parties as employees of the defendant for life. Each of the claimants had been employed for some years at a fixed rate of wages, usually upon an hourly basis but payable monthly or semimonthly.

The theory of plaintiffs is that on July 28, 1930, (with two exceptions), the vice-president and general manager of the refinery plant called the employees, who had rendered long years of service separately into his office and made with each a contract, to pay him, for the rest of his natural life, a sum equal to one-half of the wages he was then being paid. The consideration for the contracts, it is said, arose out of the relationship then existing, the desire to provide for the future welfare of these comparatively aged employees and the provision in the alleged contracts that the employees would call at the office for their several checks each pay-day.

Most of the employees were participants in group insurance, the premiums for which had been paid approximately one-half by the employee and one-half by the company, and, according to plaintiffs, their parts of the premiums were to be deducted from their payments as formerly. This procedure was followed.

The employees were retained on the pay roll, but, according to their testimony, they were not to render any further services, their only obligation being to call at the office for their remittances. Most of them testified that it was agreed that the payments were to continue throughout the remainder of their lives. But two testified that nothing was said as to the time during which the payments were to continue. As to still others the record is silent as to direct testimony in this respect.

The payments were made regularly until June 1, 1931, when they were cut off and each of the employees previously receiving the same was advised by defendant's personnel officer that the arrangement was terminated.

Defendant does not controvert many of these facts, but insists that the whole arrangement was included in a letter sent to each of the employees as follows:

"Confirming our conversation of today, it is necessary with conditions as they are throughout the petroleum industry, to effect substantial economies throughout the plant operation. This necessitates the reducing of the working force to a minimum necessary to maintain operation. In view of your many years of faithful service, the management is desirous of shielding you as far as possible from the effect of reduced plant operation and has, therefore, placed you upon a retirement list which has just been established for this purpose.

"Effective August 1, 1930, you will be carried on our payroll at a rate of $——— per month. You will be relieved of all duties except that of reporting to Mr. T. E. Sullivan at the main office for the purpose of picking up your semi-monthly checks. Your group insurance will be maintained on the same basis as at present, unless you desire to have it cancelled." (Signed by the vice-president.)

It contends and offered evidence that nothing was said to any employee about continuing the payments for his natural life; that the payments were gratuitous, continuing at the pleasure and will of defendant; that the original arrangement was not authorized, approved, or ratified by the board of directors, the executive committee thereof, or any officer endowed with corporate authority to bind the company; that there was no consideration for the promise to make the payments; and that it was beyond the power of any of the persons alleged to have contracted to create by agreement or by estoppel any liability of the company to pay wages to employees during the remainders of their lives, if they did not render actual services. Defendant admits the payments as charged and the termination of the arrangement on June 1, 1931.

The employees assert that there was ample authority in the vice-president and general manager to make a binding contract of the kind alleged to have existed; that, irrespective of the existence or nonexistence of such authority, the conduct of the company in making payment was ratification of the original agreement and that defendant is now estopped to deny validity of the same.

Plaintiff Kogan, an employee aged 72, testified that for some years prior to July 28, 1930, he had been employed as a drill pressman and in general repair work in the machine shops; that on July 28, 1930, he talked to Mr. Anglin, the vice-president and general manager, in the latter's private office; that Anglin said then that the oil industry was in a deplorable condition; that the management found it necessary to cut down expenses, and therefore, to lay off certain employees; that the witness was to be relieved of his duties, but that he would receive one-half of his salary and would be retained upon the pay roll; that this was being done because of the witness' many years of services; that the company did not desire to discharge him without further compensation; that he would be excused from all labor and required only to report to the main office to get his checks; that the company would carry his insurance in accord with previous practice; and that he would have all the privileges of hospitalization and in other respects of regular employees. The witness said he expressed his preference to work, but was told that that was impossible. He says that he was told that the arrangement was permanent, that is, for as long as he lived; that he would receive a letter confirming this conversation, which he should keep; that his labor would end on July 31, 1930; that he received the letter within a day or two; that thereafter he reported regularly at the office and obtained the checks until May 29, 1931, when he was told by the personnel department that the check then received would be the last one. This action, he said he was then told, was taken because of the necessity for further retrenchment. He testified that he sought no other employment; that nothing was said to him about working or not working for other parties, and that when he received the letter he kept it without comment or objection.

Other claimants testified substantially the same. Beanblossom said that he was told that the layoff was by the direction of the president; that he was still on the pay roll but that he would have no work to do; that the arrangement would last all his life; and that if conditions improved he would probably get his job back. Gibson testified that nothing was said about the time during which the payments would continue but that he inferred that they were for life. Teufel testified that nothing was said about how long the payments would continue. Stout, Robb, Plowman, McClure, Smith, and Courter testified substantially as did Kogan. Reeves testified that he was told he was given a pension for life; Kendall that he was in the hospital when he heard about the arrangement with other men and sent his nurse to ask for his payments and that thereafter he received checks until June 1, 1931. Mrs. Burrell testified that her husband was deceased; that he received the letter previously mentioned and the payments, until June 1, 1931. Mrs. Hoth and Mrs. Baker testified similarly concerning their husbands. Plaintiffs offered no testimony as to any conversations between any of the deceased men and the manager. Mr. and Mrs. Hooks, son-in-law and daughter of Davenport, one of the deceased employees, testified that Wells, the plant superintendent, came to their house and said that he preferred to talk to them rather than to Davenport because the latter was not then well; that the company was desirous of making a "settlement" with him for half salary for the remainder of his life. They directed him to talk to Davenport.

In behalf of defendant, the assistant secretary testified that there were no minutes showing any corporate action with regard to the arrangement and that there was nothing in the records of the corporation, in by-laws, resolution or minutes authorizing, directing, or ratifying the payments or giving anybody authority to make the same. Anglin, vice-president and general manager in charge of manufacturing at the Lawrenceville Refinery where these men were employed, testified that he said to Kogan that, due to depressed conditions the company found it necessary to reduce expenses and lay off certain men; that it had no pension plan; that in an effort to be perfectly fair the company would keep him on the pay roll but relieve him of all duties except to pick up his check; that he said that the arrangement was voluntary with the company, and terminable at its pleasure, and that he hoped it would last during Kogan's lifetime, but that there might be a change in the policy of the company. His testimony as to the other employees was the same. He

denied promising any of them that the payments would persist so long as they lived. He sent the letters as he promised confirming the arrangement. He testified that the letters were in compliance with what he had said; that no complaint or demand for any additional provisions was thereafter made; that he himself was employed orally; that he had no written contract; that he had no authority from the directors to make the arrangement; that he hired and fired men in Lawrenceville upon recommendation of the foreman; that a change in the management occurred when the Indian Refining Company was purchased by the Texas Company between October, 1930, and January, 1931; and that after the latter date he was not general manager at Lawrenceville.

Wells testified that he was plant superintendent; that he had no authority to make any contracts such as are alleged in the bill of complaint; that he sent some of the complainants in to see the manager; that he talked to the daughter and son-in-law of Davenport because the latter was ill, but later, on their suggestion, talked to Davenport. He testified that he said nothing about a settlement but did say that one-half of Mr. Davenport's salary would be paid to him. He said that he recalled no conversation with Courter and that he never told any of the claimants that the arrangement was permanent.

The present vice-president and general manager testified that he came into office January, 1931; and that no complaint was received by him by any plaintiff until suit was started.

Thus it is undisputed that a separate arrangement was made by the local office with each of the claimants, most of them on July 28, 1930, to continue them upon the pay roll, deliver to them semimonthly a check, upon their calling for same, for one-half of the former wages; that this was done until June 1, 1931. It is also undisputed that the letters sent out said nothing about how long the payments should continue but were wholly silent in that respect. It is also undisputed that insurance payments were deducted from the checks that were delivered; that the employees were retained on the pay roll; that they did no active work after August 1, 1931; that they received their checks as mentioned; that the payments terminated on June 1, 1931; that most of them called at the office for their checks and received same; and that in at least two instances the checks were mailed. The controverted question of fact arises upon the testimony of most of the plaintiffs that each of them was told that the payments would continue until their death. This is denied.

Let us assume, without so deciding, for the purpose of disposition of this case, that each of the employees was told that the payments would continue for his lifetime. Then the questions remaining are legal in character. The arrangement was made by no corporate officer having authority to make such a contract. Under the by-laws, corporation transactions as recorded in the minutes, there was no authorization or ratification of any such contract. It is urged, however, that by continuing to pay the checks the corporation ratified the previously unauthorized action. The facts render such conclusion dubious. I am unable to see how knowledge of the mere fact that men's names were on the pay roll and checks paid to them could create any estoppel to deny authority, in the absence of proof of knowledge upon the part of the duly authorized officers of the company that the men were not working but were receiving in effect pensions or that they had been promised payments for life. Consequently, there was no ratification express or implied and no estoppel.

Presented also is the further question of whether, admitting the facts as alleged by plaintiffs, there was any consideration for a contract to pay a pension for life. However strongly a man may be bound in conscience to fulfill his engagements, the law does not recognize their sanctity or supply any means to compel their performance, except when founded upon a sufficient consideration. Volume 6, American & English Encyclopedia of Law, p. 673 (2d Ed.)

The long and faithful services of the employees are relied upon as consideration; but past or executed consideration is a self-contradictory term. Consideration is something given in exchange for a promise or in a reliance upon the promise. Something which has been delivered before the promise is executed, and, therefore, made without reference to it, cannot properly be legal consideration. Williston on Contracts, vol. 1, § 142; 13 Corpus Juris, 359; Shields v. Clifton Hill Land Co., 94 Tenn. 123, 28 S. W. 668, 26 L.R.A. 523, 45 Am.St.Rep. 700; Restatement of the Law of Contracts, vol. 1, p. 88.

■ It is further contended that there was a moral consideration for the alleged contracts. The doctrine of validity of moral consideration has received approval in some courts, but quite generally it is condemned because it is contrary in character to actual consideration. Early Illinois cases, (Spear v. Griffith, 86 Ill. 552; Lawrence v. Oglesby, 178 Ill. 122, 52 N.E. 945) recognize its validity. But their doctrine has been modified and no longer prevails in Illinois. See Hart v. Strong, 183 Ill. 349, 55 N.E. 629; Hobbs v. Greifenhagen, 91 Ill.App. 400; Schwerdt v. Schwerdt, 235 Ill. 386, 85 N.E. 613; Finch v. Green, 225 Ill. 304, 80 N.E. 318; Strayer v. Dickerson, 205 Ill. 257, 68 N.E. 767; Cutwright v. Preachers Aid Society, 271 Ill.App. 168; Kirkpatrick v. Taylor, 43 Ill. 207; Williams v. Forbes, 114 Ill. 167, 28 N.E. 463. Thus in Hart v. Strong, 183 Ill. 349, 55 N.E. 629, 631, the court said: "The agreement to·receive less than the amount due on the note was made upon the purely moral consideration that John W. Hart, believing himself about to die, thought he ought not to have exacted so large a consideration for the reconveyance. But such an obligation does not form a valid consideration unless the moral duty were once a legal one. 'But the morality of the promise, however certain or however urgent the duty, does not, of itself, suffice for a consideration.' 1 Pars. Cont. 434."

■ Upon the same ground, appreciation of past services or pleasure afforded the employer thereby is not a sufficient consideration. Schwerdt v. Schwerdt, 141 Ill. App. 386; Kirkpatrick v. Taylor, 43 Ill. 207; Williston on Contracts, vol. 1, pp. 230, 231; Vehon v. Vehon, 70 Ill.App. 40; Heaps v. Dunham, 95 Ill. 583; Williams v. Forbes, 114 Ill. 167, 28 N.E. 463. So Williston says (Contracts, vol. 1, p. 230): "* * * if there be no legal consideration, no motive, such as love· and respect, or affection for another or a desire to do justice, or fear of trouble, or a desire to equalize the shares in an estate, or to provide for a child, or regret for having advised an unfortunate investment, will support a promise."

■ Plaintiffs have proved that they were ready, willing, and able to travel to and report semimonthly to the main office. But this does not furnish a legal consideration. The act was simply a condition imposed upon them in obtaining gratuitous pensions and not a consideration. The employees went to the office to obtain their checks. Such acts were benefits to them and not detriments. They were detriments to defendant and not benefits. This is not consideration. Williston on Contracts, vol. 1, pp. 231–235, and cases cited; Restatement of Contracts, par. 75, illus. 2.

■ In the absence of valid agreement to make payments for the rest of their natural lives, clearly the arrangement was one revocable at the pleasure of defendant. If defendant agreed to make the payments for life, then, fatal to plaintiffs' cases is the lack of consideration. We have merely a gratuitous arrangement without consideration, and therefore, void as a contract.

■ In this enlightened day, I am sure, no one controverts the wisdom, justice, and desirability of a policy, whether promoted and fostered by industry voluntarily or by state or federal government, looking to the promotion and assurance of financial protection of deserving employees in their old age. We have come to realize that the industry wherein the diligent worker labors for many years should bear the cost of his living in some degree of comfort through his declining years until the end of his life. To impose this expense upon the industry, to the creation of whose product he has contributed, is not unfair or unreasonable, for, eventually, obviously, under wise budgeting and cost accounting systems, this element of cost is passed on to the consumer of the product. The public bears the burden—as, indeed, it does eventually of all governmental expenditures and corporate costs, either in taxes or price of products purchased. Surely no one would have the temerity to urge that such a policy is not more fair and reasonable, more humane and beneficent, than the poorhouse system of our earlier days. The recognition of the soundness of this proposition is justified by the resulting contribution to the advance of standards of living, hygienic and sanitary environment, and, in some degree at least, of culture and civilization.

But, in the absence of statute creating it, such a policy does not enter into the relationship of employer or employee, except when so provided by contract of the parties. The court is endowed with no power of .legislation; nor may it read into contracts provisions upon which the parties' minds have not met.

Viewing the testimony most favorably for the plaintiffs, despite the desirability of the practice of liberality between employer and employee, the court must decide a pure-

**6**

ly legal question—whether under plaintiffs' theory there were valid contracts. The obvious answer is in the negative. Consequently, there will be a decree in favor of defendant dismissing plaintiffs' bill for want of equity. The foregoing includes my findings of fact and conclusions of law.