Argued March 25, affirmed in part; modified and reversed in part; and remanded for the entry of a new decree consistent with this opinion August 19, reconsideration denied September 18, petition for review denied Case No. 350-760, allowed Case No. 352-667, December 10, 1974

ROSE CITY TRANSIT CO. ET AL, *Appellants–Cross-Respondents, v.* CITY OF PORTLAND ET AL (No. 350 760), *Respondents–Cross-Appellants.*

CITY OF PORTLAND ET AL, *Respondents–Cross-Appellants, v.* ROSE CITY TRANSIT CO. ET AL (No. 352-667), *Appellants–Cross-Respondents,* CHARLES C. BOWEN, *Defendant,* DIVISION No. 757, AMALGAMATED TRANSIT UNION ET AL, *Defendants-Respondents.*

525 P2d 1325

*R. R. Bullivant* and *Allan Hart,* Portland, argued the cause for appellants–cross-respondents. With them on the briefs were Douglass M. Hamilton; Robert M. Kerr; Edwin J. Peterson; Bullivant, Wright, Leedy, Johnson, Pendergrass & Hoffman; Lindsay, Nahstoll, Hart, Duncan, Dafoe & Krause; and Tooze, Kerr, Peterson, Marshall & Shenker, Portland.

*James H. Clarke* and *Gerard K. Drummond,* Portland, argued the cause for respondents–cross-appellants. With them on the briefs were Marian C. Rushing, former Portland City Attorney; John W. Osburn, Portland City Attorney; Kell, Alterman, Runstein, Thomas & Kell; Dezendorf, Spears, Lubersky & Campbell; and Rives, Bonyhadi & Drummond, Portland.

*Don G. Swink,* Portland, argued the cause and filed the brief for defendants-respondents.

*Robert E. Kopp* and *David M. Cohen,* Department of Justice, Washington, D. C., filed a brief amicus curiae on behalf of Claude S. Brinegar, Secretary of Transportation of the United States of America. With them on the brief were Irving Jaffe, Acting Assistant Attorney General, Sallyanne Payton, Joseph A. Blundon and Arthur R. Silen, Washington, D. C.

Before FOLEY, Presiding Judge, and FORT and LUSK, Judges.

FOLEY, J.

This is a consolidated appeal of two cases arising out of the termination by the city of Portland of a mass transit franchise awarded to Rose City Transit Co. (Rose City). The first case (the franchise case) was brought by Rose City Transit Co. and Landport Co. (the Companies) as a declaratory judgment proceeding against the city of Portland (the City) seeking a decree declaring that the City had breached the terms of the mass transit franchise by unilaterally and improperly terminating the franchise; the Tri-County Metropolitan Transportation District of Oregon (Tri-Met),[1] a municipal corporation, subsequently became a party defendant. The second case (the pension case) was brought by the City and Tri-Met as a declaratory judgment proceeding seeking a decree setting the parties' various pension rights and liabilities in regard to various classes of employes, both active and retired.

[1] *See* Horner's Market v. Tri-County Trans., 2 Or App 288, 467 P2d 671, *aff'd* 256 Or 124, 471 P2d 798 (1970).

The union and a number of employes and former employes of Rose City, some members of the union, some not, were named as defendants in the pension case. The cases were consolidated and tried in stages, as agreed by stipulation of the parties, before the trial court sitting without a jury.

## I. THE FRANCHISE CASE

*Factual background*

In 1936 the City first granted an exclusive franchise to the Portland Traction Company for the operation of mass transit vehicles on the streets of the city of Portland; this franchise was for a 20-year period. The Portland Traction franchise expired in 1956 and the system was transferred by Portland Traction to the Rose City Transit Co.; the City then granted Rose City the first of a series of temporary, short-term, revocable permits.

During 1958 Landport Co. was incorporated as a wholly owned subsidiary of Rose City. All of Rose City's assets, both real and personal, were eventually transferred to Landport and leased back by Rose City. At all times Landport, Rose City and Portland Traction were wholly owned subsidiaries of Portland Transit Co.

In 1962 agreement between the City and Rose City was reached on a new, 10-year franchise, effective January 1, 1963. The Portland City Council adopted the franchise as Ordinance No. 115674 on August 22, 1962. Throughout the period of the franchise, and, in fact, since after the Second World War, the Portland mass transit system was faced with continually decreasing ridership on one hand and continually increasing fares on the other.

On November 15, 1968, pursuant to a provision of the franchise, Rose City filed application for its third fare increase. On December 12, 1968, the Portland City Council deferred action on the requested fare increase and adopted a resolution terminating the franchise "for cause," purportedly in accordance with Section 23 of said franchise. The City thereafter began proceedings to take over the system. On August 13, 1969 the City tendered the company revenue certificates, purportedly as provided in the franchise, as payment for the transit system; Rose City rejected the tender. On August 14, 1969, Rose City and Landport filed the complaint for declaratory judgment in the franchise case, seeking, *inter alia,* a judicial declaration that the 1962 franchise was not validly terminated or revoked by the City on December 12, 1968. On August 22, 1969, the City and Tri-Met filed their answer and a counterclaim in the franchise case in which they prayed for a declaration by the court that the franchise had been validly terminated, that the Companies should accept revenue certificates, that the Companies were required to convey the system, and asking, among other requests, that the court set a fair and reasonable value for the Rose City properties.

On November 30, 1969, Rose City, Landport and the City executed a Memorandum of Understanding (hereinafter called take-over agreement), which recited that the Companies would turn over to the City the possession of (but not the title to) the Companies' real property, plant and equipment, and that on December 1, 1969, the City would commence operation of the Portland mass transit system. The take-over agreement further recited that the parties would proceed to trial in both the franchise and the retirement cases,

seeking therein a judicial determination of the parties' various rights and liabilities under the franchise agreement and the various labor contracts. A document was then executed by all the parties wherein Tri-Met assumed the City's obligations under the take-over agreement.

On August 3, 1972, after trial on the issues raised, the circuit court entered a decree in which it adjudged that the franchise was validly terminated, that the fair value under the franchise was $2,975,782.65, that the City and Tri-Met were presently obligated to pay that sum, without interest up to the date of the decree, and that Tri-Met was obligated to pay the same in cash. Upon proper cash tender to Rose City or Landport, the Companies were obligated to convey title to the properties to the City or its designate.

The Companies appeal from all portions of the decree while the City and Tri-Met cross-appeal from that portion of the decree which they contend provides for post-decree interest.

*Scope of review*

■ Both the City and Tri-Met contend that this court's power to review the Portland City Council's action in the termination of the franchise is limited to a determination that the council acted reasonably and in good faith to protect the public interest; they contend that this court cannot retry the facts or determine substantively if this was, in its view, the correct decision for the council to make. Both the City and Tri-Met contend that these matters are within the sole discretion of the city council. We do not agree. A franchise is a contract between a city and a franchisee.

"When the right to use the streets is granted and accepted and all conditions imposed incident to the right performed, it ceases to be a mere license and becomes a valid contract, and constitutes a vested right. The consideration for the grant is said to be the benefit which the public derives from the use and exercise of the franchise. The conditions therein are binding, the same as the terms of any other contract, both on the municipality and the company, and their successors. The laws existing at the time and place of the contract form a part of it. * * *" (Footnotes omitted.) 12 McQuillin, Municipal Corporations § 34.06 (3d ed 1970).

*Accord, City of Owensboro v. Top Vision Cable Co. of Ky.,* 487 SW2d 283 (Ct App Ky 1972), *cert denied* 411 US 948 (1973). *See Public Market Co. v. Portland,* 171 Or 522, 130 P2d 624, 138 P2d 916 (1943). *See generally,* 36 Am Jur2d 728-30, Franchises § 6; I Pond, Public Utilities 283-84, § 120 (4th ed 1932).

Since the franchise has all the incidents of a contract, the rights and liabilities of the parties to that contract are evaluated in standard contract terms, with one notable exception. *City of Joseph v. Joseph Water Works Co.,* 57 Or 586, 591, 111 P 864, 112 P 1083 (1910), states:

"It is a rule of construction that, if the terms of the franchise are doubtful, they are to be construed strictly against the grantee and liberally in favor of the public. What is not unequivocally granted is withheld, and nothing passes by implication, except what is necessary to carry into effect the obvious intent of the grant. [Citations omitted.]"

*See also, Copeland v. City of Waldport,* 147 Or 60, 70, 31 P2d 670 (1934); 36 Am Jur2d 747-49, Franchises § 26; I Pond, Public Utilities 393-96, § 152 (4th ed

1932). Our review of the parties' actions under this franchise is in light of these general principles.

■ The other area in which the power of this court to review the judgment below is in question arises in our consideration of the value placed on the properties. The City and Tri-Met urge that the action below was an action at law and that our review must be limited to whether there was evidence to support the finding. The Companies contend that the proceeding was a suit in equity and that this court must review the issues de novo. Viewing the proceedings in their entirety, we conclude that they were equitable in nature and review the case de novo.

*Termination of the franchise "for cause"*

Section 23 of the franchise ordinance states:

"This franchise shall continue in effect for the period of ten (10) years after same becomes effective, unless sooner terminated as in this paragraph provided.

"The Council shall have the right to revoke and terminate this franchise at any time for cause upon at least six (6) months prior notice to the Company in writing; and no lapse of time, expenditure, or any other thing shall be deemed to give the Company any vested interest or right in the continuance of this franchise.

"In the event that during the period specified in Section 21 hereof the Company does not earn a fair profit and a projection of its operations into the succeeding two (2) months, indicates a continuance of such failure to earn the same, as stipulated in said Section, and it is determined by the Company and the City Council that it would not be practicable, possible or in the public interest to cure the deficiency by an increase in fare schedules, elimination of some of the required routes or a reduction in service, or any combination thereof, then, and under such circumstances, the Company

may then give six (6) months' notice in writing to the City Council that it elects to surrender its franchise and cease operations of a transportation system hereunder."

In its termination of the franchise under Section 23, the "cause" given by the city council was as follows:

"* * * [F]or the cause that fare increases above the present 35¢ level cannot reasonably continue indefinitely as a matter of public good and interest, that such increase with possible future increases will result in such additional loss of patronage as to render the mass transit service within the city economically unfeasible and unreasonable, despite the public need and the benefit to the public and to the property owners of the city from a reasonable transit service.

"* * * * * *"

Later, in answering the third amended complaint of the Companies, the City and Tri-Met elaborated upon the original reasons for termination: (1) continued company operation would have made bus service economically unavailable to the elderly and the poor; (2) such continued operation would have been economically destructive of the transit system; and (3) such continued operation, under Rose City's existing policies, would have caused the transit system to become depreciated, obsolete and undercapitalized so that at the end of the franchise term the system could not thereafter be operated as a mass transit system.

■ The Companies first contend that "for cause" in the franchise can only mean termination in the event of breach by the company. The franchise agreement does not support this conclusion. Section 26 of the franchise provides specifically that if the company violates any of the provisions contained in the fran-

chise the council will notify the company of such violation and will give the company a period of 30 days to cure such violation. Failure to cure within the 30-day period will enable the City to declare a forfeiture and a revocation of the franchise. The existence of Section 26 adequately protects the City in the event of breach by the company without resort to Section 23.

Relevant case law also supports the interpretation that "for cause" means something other than breach by the company. For example, in *R. J. Cardinal Co. v. Ritchie,* 218 Cal App2d 124, 32 Cal Rptr 545 (1963), the court construed a sales agreement in which a sales agent's employment with the company could be terminated for cause. After reviewing the agreement, the court concluded:

> "* * * [T]hese phrases [for cause, for just cause or for good cause] have been found to be difficult to define with precision and to be largely relative in their connotation, depending upon the particular circumstances of each case. * * *
>
> "We apprehend at the nucleus of this concept of 'cause' or 'good cause' the essential ingredients of reasonable grounds and good faith. * * *
> "* * * * * *
> "We are of the opinion that a right to terminate 'for cause' or 'for good cause' means upon reasonable grounds assigned in good faith. * * * Such a right since it 'is not wholly controlled by the will of the promisor himself' * * * and since it does not permit the one invoking it 'to withdraw from the agreement at ... [his] own unrestricted pleasure' * * * is not invalid as an arbitrary and absolute power to cancel." 218 Cal App2d at 144-46. (First two brackets ours.)

Similarly, in *Quick v. Southern Churchman Co.,* 171 Va 403, 417, 199 SE 489 (1938), the court concluded:

> "It is obvious that 'just cause' or 'good cause'

is not synonymous with legal cause. The right to cancel for a legal cause exists independently of the contract. One can terminate any contract for legal cause. No extension of time is required after a notice therefor. On the other hand, 'just cause' or 'good cause' cannot be reduced to a legal certainty. To be effective, it must relate to the circumstances relied on. The grounds upon which it is based must be reasonable, and there should not be an abuse of the conferred right. It must be a fair and honest cause or reason, regulated by good faith on the part of the party exercising the power. It limits the party to the exercise of good faith, based upon just and fair grounds as distinguished from an arbitrary power. To this extent, it includes causes outside of legal causes.

"* * * [T]he decisions hold that such a clause permits cancellation upon other than legal grounds, when the power is exercised in good faith upon fair and reasonable grounds. [Citations omitted.]"

*See also Helsby v. St. Paul Hospital and Casualty Company,* 195 F Supp 385 (D Minn 1961), *aff'd* 304 F2d 758 (8th Cir 1962); *Local 205, United Elec., R. & M. Wkrs. v. General Elec. Co.,* 172 F Supp 53 (D Mass 1959); *Cook, Commissioner of Revenue, v. Consolidated Cases,* 209 Ark 189, 189 SW2d 897 (1945). *See generally,* 17 Am Jur2d 968-69, Contracts § 495. Other cases have indicated that public necessity or general welfare of the public can constitute good cause. *See O'Hagen v. Board of Zoning Adjustment,* 19 Cal App3d 151, 96 Cal Rptr 484 (1971); *Smith v. Ladage,* 397 Ill 336, 74 NE2d 497 (1947).

We conclude that the term "for cause" as used in Section 23 of the franchise does not limit the City to termination only upon breach or some other violation of the contract by the Companies. While the term

"for cause" does exclude the notion of any right of the City to terminate the franchise at will, it does not limit that right to cases of breach of provisions of the franchise by Rose City. On the contrary, as here used, "for cause" has the meaning delineated in the opinions from which we have quoted above, and "public interest" may be such a cause. If, as contended by the Companies, "for cause" were construed to mean the same thing as "for breach," Section 23 would be surplusage, as Section 26 expressly governs cases of breach. The construction which we adopt harmonizes Sections 23 and 26.

■ The Companies contend that the court improperly excluded extrinsic evidence as to the purported meaning of the phrase "for cause" in the franchise. However, counsel for the Companies admitted during trial that there was no ambiguity in the franchise agreement. Absent an ambiguity, extrinsic evidence as to possible meanings of the term is not admissible.[2]

■■ The Companies argue that the three additional reasons, supra, for termination of the contract should not have been considered by the trial court on the ground that such reasons were an improper addition of new claims. The trial court concluded that the City was not estopped from giving additional reasons and furthermore, that reasons (1) and (2) do not raise additional grounds for termination beyond those stated in the motion for termination made at the city council

---

[2] However, it should be noted that the evidence was admitted under the Rule and upon review reflects only that the phrase "for cause" was added in the final draft of the franchise agreement, not being present in any prior draft. The most that can be concluded from this is that the term "for cause" was meant only to be a limitation on the ability of the City to terminate "at will."

meeting. The basic rule is stated in *Railway Co. v. McCarthy*, 96 US 258, 267-68, 24 L Ed 693 (1877):

> "Where a party gives a reason for his conduct and decision touching anything involved in a controversy, he cannot, after litigation has begun, change his ground, and put his conduct upon another and different consideration. He is not permitted thus to mend his hold. He is estopped from doing it by a settled principle of law. * * *"

*Accord, Ward v. Queen City Ins. Co.*, 69 Or 347, 138 P 1067 (1914). The reason for this rule, however, is equitable; the courts hold that it would be unfair for a party to shift its ground and assert other reasons which it had previously waived. *Eaid v. National Casualty Co.*, 122 Or 547, 559, 259 P 902 (1927). Professor Williston further explains:

> "It is due to a confusion, under the general term of waiver, of cases of this sort with cases where neither consideration nor estoppel exists which has led to the general statement, frequently made, that refusal to perform on one ground waives all other objection. Estoppel, however inadequately established in some cases, is recognized as the essential basis of the doctrine. * * *" (Footnote omitted.) 5 Williston, Contracts 519, 521, § 742 (3d ed 1961).

*See also,* 3A Corbin, Contracts 522, 524-26, § 762 (1960).

■ We agree with the trial court that the additional reasons (1) and (2) given by the City and Tri-Met in answer to the third amended complaint are not new but rather further explain the original reasons. As to the third additional reason, even though we ignore it and the evidence in support of it, the evidence is otherwise adequate to justify the City in its decision that it had cause to terminate the franchise. In addition, at no time have the Companies alleged or proven that they

were in any way prejudiced by the City's and Tri-Met's additions to the reasons given at the city council meeting. The City should not be estopped under these circumstances from amplifying upon its reasons.

■ From our review of the record we conclude that there was "cause" for the termination. As noted by the trial court in its opinion, the City was faced with a situation of ever-increasing fares combined with ever-decreasing ridership of the buses. With increased fares, citizens who needed the transit system the most (i.e., the elderly, the people of low incomes and the youth) were more and more required to either avoid its use entirely or to anticipate ever-increasing expense for the use of the system. The vicious circle of increased fares followed by decreased ridership followed by another round of increased fares and decreased ridership was the basic cause which prompted the city council to terminate the franchise. There is no evidence that the City acted in bad faith in so doing. Under the totality of the circumstances, we find that the City properly terminated "for cause" within the meaning of the franchise.

*Valuation of intangibles*

■ Section 25 of the franchise gives the City the option to purchase the assets of the Companies following termination:

"The City may purchase, condemn or acquire in any other lawful manner all or any portion of the real property, plant and equipment used by the Company in its operations under this franchise.

"The price to be paid for the real property, plant and equipment which the City has indicated, in writing, its desire to acquire, shall be the fair value of the real property, plant and equipment as

of the last day of the six (6) months' period of continued operations referred to in Section 24. * * *

"* * * * *

"Fair valuation of the real property, plant and equipment which the City has designated for its acquisition shall be based upon the fair value of the real property, plant and equipment, reduced by the amount of any lien, encumbrance or obligation of the Company which the City may agree to assume, but shall not be determined by stockholder investment or expectation of profits and shall not include any sum for the value of the unexpired portion of this franchise.

"* * * * * *."

The Companies contend that, in spite of this provision, they are entitled to "just compensation" and that such compensation must include payment for certain intangible assets including the value of the routes taken, schedule preparation, employe training and other "going-concern" values. While this viewpoint might be correct in the absence of agreement to the contrary, here the franchise agreement alone controls the question of compensation. In *Albrecht v. United States,* 329 US 599, 603, 67 S Ct 606, 91 L Ed 532 (1947), the Court said:

"* * * The Fifth Amendment does not prohibit landowners and the Government from agreeing between themselves as to what is just compensation for property taken. * * * Nor does it bar them from embodying that agreement in a contract * * *."

In a case similar to the one at bar, *Honolulu Rapid Transit Company* [HRT] *v. Dolim,* 459 F2d 551 (9th Cir), *cert denied* 409 US 875 (1972), the franchise permitted the city to purchase Honolulu Rapid Transit's property and had a clause setting how the amount paid

would be determined, which clause excluded therefrom value of the franchise, good will or other intangibles. The city decided to purchase the property under the franchise and HRT contended that the clause was unconstitutional since it provided for the taking of HRT's property for public use without payment of just compensation. The court of appeals rejected this argument:

"* * * HRT disregards the fact that there was here no 'taking' by the City. This was not a unilateral exercise by the City of its power of eminent domain. The right of the City to acquire HRT's property at a certain price was not based upon its power to take, but upon agreement between the parties. Thus there was no event to which HRT's asserted constitutional rights attached. The transaction had 'passed out of the range of the Fifth Amendment' and was a situation where 'Parties, supposedly with due regard to their own interests, bargain between themselves as to compensation.' * * *

"* * * * *

"* * * The doctrine of unconstitutional conditions does not strip state and federal governments of this indispensable and long acknowledged power [to employ the remedies available to private citizens in enforcing a contract].

"Nor does the fact that the alternatives to the franchise available to HRT in 1921 were unattractive render the agreement a coerced one. The acceptance of HRT was an act of free choice." (Footnote omitted.) 459 F2d at 553.

Consonant with the above, in 2 Orgel, Valuation Under Eminent Domain 59, 60, § 200 (2d ed 1953), the author sets forth the rule that the grantor of the franchise may stipulate the terms for arriving at compensation for taking.

The value placed upon the assets of the Companies must be derived from the terms of the contract,

not from general principles of condemnation law. Thus, the Companies' reliance upon *Mtr. of City of N.Y. (5th Ave. Coach Lines)*, a condemnation case, 273 NYS2d 52, 18 NY2d 212, 219 NE2d 410, *modified* 274 NYS2d 349, 18 NY2d 741, 221 NE2d 174 (1966), *appeal dismissed* 386 US 778, 87 S Ct 1480, 18 L Ed 2d 524 (1967); 294 NYS2d 502, 22 NY2d 613, 241 NE2d 717 (1968), *modified* 300 NYS2d 41, 24 NY2d 773, 247 NE2d 861 (1969), is misplaced.

■ The Companies contend that even looking at the franchise agreement itself, they are entitled to payment for intangible going-concern value. The Companies point to the use of the word "plant" to support this contention. The only Oregon case on the subject which has come to our attention is *Walter v. Turtle*, 146 Or 1, 5, 29 P2d 517 (1934), in which the court stated:

> "Generally speaking, the plant of the employer may be said to be the machinery, tools and equipment as well as the place where such machinery, tools and equipment are operated in carrying on the business in which he is engaged. * * *
> " 'Plant means the fixtures, tools, apparatus, appliances, etc., necessary to carry on any trade, mechanical operation or process.' [Citations omitted.]"

*Accord,* 2 Orgel, supra at 81, § 206; II Bonbright, Valuation of Property 920 (1937). *See* definition, 70 CJS 1100-02, Plant. There is no indication in the franchise agreement that the word "plant" refers to anything other than tangible assets.

We conclude that the Companies are limited to the compensation provided for in the franchise agreement and that the agreement limits compensation to the fair value of the real property, plant and equip-

ment, which value does not, by its terms, include separate compensation for intangibles.[9]

*Valuation of tangible property*[4]

For the purposes of this appeal, the Companies have narrowed their disagreement with the trial court on the issue of valuation to two main areas: the value

[9] As noted supra, the Companies' reliance upon Mtr. of City of N.Y. (5th Ave. Coach Lines), 273 NYS2d 52, 18 NY2d 212, 219 NE2d 410, *modified* 274 NYS2d 349, 18 NY2d 741, 221 NE2d 174 (1966), *appeal dismissed* 386 US 778, 87 S Ct 1480, 18 L Ed 2d 524 (1967); 294 NYS2d 502, 22 NY2d 613, 241 NE2d 717 (1968), *modified* 300 NYS2d 41, 24 NY2d 773, 247 NE2d 861 (1969), is misplaced since in that case the municipal agency obtained possession of the line under the power of eminent domain, not pursuant to a bilateral agreement. We also note that in the *Fifth Avenue* case the lower court had already awarded the companies the value of their tangible assets as part of an operating system; some commentators have suggested that the Court of Appeals decision in *Fifth Avenue,* in fact, provided for double compensation when it determined that intangibles must be valued separately. *See* Note, *Eminent Domain,* 12 Vill L Rev 666, 667-68 (1967). *See also* 2 Orgel, Valuation Under Eminent Domain 37, § 194 (2d ed 1953), where a distinction is drawn between lump-sum evaluation, where the value of the assets in use inheres in the amount awarded, and separate evaluation in which intangibles are counted separately from the "bare bones" value of the tangible assets themselves.

In its valuation opinion, the trial court specifically indicated that the tangible assets were valued as part of a going transit system. Any additional value given separately for intangible assets not only is contrary to the franchise agreement, but also runs into the possible double compensation problems discussed supra. Assuming *arguendo* that Omaha v. Omaha Water Co., 218 US 180, 30 S Ct 615, 54 L Ed 991, 48 LRA (ns) 1084 (1910), and National Waterworks Co. v. Kansas City, 62 F 853 (8th Cir 1894), apply to the facts at bar as argued by the Companies, the trial court's valuation of the assets as part of a going system adequately meets the demands of those cases.

[4] A breakdown of the valuation of all of the tangible assets as found by the court is as follows:

| | |
|---|---|
| Land | $522,750.00 |
| Center Street Property | |
| Three main bldgs. | 355,344.00 |
| Several small bldgs. | 30,486.00 |
| Two small parcels of real estate | 3,000.00 |

of the Center Street buildings and the value of the office equipment and machinery.

### A. Center Street buildings

The only issue remaining on the valuation of the Center Street buildings relates to allowable deductions from the replacement cost. For the purposes of appeal the Companies accept the trial court's finding as to replacement cost of the buildings. Their only contention is that the total depreciation of 78 percent found by the court was excessive; the Companies argue that obsolescence is not a proper item for deduction when the replacement-cost method of valuation is used. We disagree.

It is noted in I Bonbright, Valuation of Property 160-61 (1937), that:

> "If the loss * * * of the present property would warrant its owner * * * in acquiring a virtual replica, the property may then properly be valued at the cost of its replica * * *. But in most disputed appraisals, the owner of the property would rationally replace it, not with an exact duplicate, but rather with a new or otherwise different substitute, which would be either more or less satisfactory than his present property. * * * Moreover, even

| | |
|---|---:|
| New buses | 1,606,206.25 |
| Old buses | 195,000.00 |
| Junk buses | 2,900.00 |
| Autos and trucks | 15,800.00 |
| Shop mach. and tools | 130,112.40 |
| Washers, bus lift, fuel tanks | 28,717.00 |
| Fare box vaults and stands | 12,300.00 |
| Furn. and office equip. | 40,000.00 |
| Radios and misc. equip. | 7,500.00 |
| Bus stop signs | 6,650.00 |
| Misc. tangible assets | 19,017.00 |
| | $2,975,782.65 |

if, by rare coincidence, he were able to find the identic twin, the probabilities are all against his wanting to acquire it. His best available option will be to secure a newer, or more modern, or more adaptable, substitute.

"Under these circumstances, replacement cost * * * cannot be accepted without revision as a measure of value. A further allowance must be made for the inferiority or superiority of the present property to the substitute property. In most appraisals, the property in question, being old and obsolescent, would be inferior to the new substitute, and the adverse value of this inferiority must be deducted from replacement cost new. This deduction is generally, though inaccurately, called 'depreciation.' * * *"

Bonbright goes on to note at 185:

"* * * Depreciation should now refer to the difference between the present worth of the old and obsolescent asset and the present worth of the hypothetical, new and modern asset.

"* * * [T]he popular distinction between 'physical' and 'functional' depreciation is a false antithesis. *Any* depreciation of a physical asset, so far as it need be considered by an appraiser, is at once physical and functional."

*Accord, Reynolds Metals v. Dept. of Rev.*, 258 Or 116, 119-20, 477 P2d 888, 481 P2d 352 (1970); 2 Orgel, supra at 57, § 199; Schmutz, Condemnation Appraisal Handbook 56 (1963).

A complete review of all the evidence introduced in relation to valuation of the Center Street properties would only serve to unnecessarily lengthen this opinion. Briefly, we note that the buildings in question were constructed around 1912 for use as trolley repair barns, that the property had been modernized for use as bus repair facilities, but that there was testimony

they still were antiquated and out of date. While there was also testimony the buildings were still satisfactory for bus operation use, we conclude that the trial court's finding of 78 percent depreciation was correct and should be affirmed.

### B. Office equipment

■ The trial court placed a value of $40,000 upon office furniture, machinery and equipment. While the testimony of the witnesses differed greatly, we are persuaded that the market value of the items testified to by one witness more nearly approximates the true value. We affirm the valuation placed by the trial court upon the items of office furniture, equipment and machinery.

### ■ Status of the parties

The Companies argue that the trial court failed to distinguish the difference in the relationships between the Companies and the city of Portland on one hand and the Companies and Tri-Met on the other. Their basic contention is that the valuation formula provided in the franchise has no application to a take-over in which the financing is done by Tri-Met. The Companies assert that the take-over agreement was negotiated only with the City and that Tri-Met succeeds to no rights under it.

Paragraph H of the take-over agreement expressly provides that the City is authorized to transfer to Tri-Met the entire bus system provided that Tri-Met first enters into a valid and binding agreement with the City, Rose City and Landport whereby Tri-Met "assumes and agrees to perform all of the City's agreements and obligations in and under this agreement, and agrees to be joined as a party defendant in the pending

franchise suit." The Companies contend that this provides obligations on the side of Tri-Met only and that the Companies are relieved of any of their obligations thereunder. We disagree. Paragraph 20 of the exhibit attached to the take-over agreement provides that the agreement and the exhibit "shall be binding upon and inure to, the benefit of the respective successors and assigns of the parties thereto." Paragraph D of the agreement provides that valuation of the bus system shall be consistent with the franchise. The use of the franchise provisions to govern the valuation is clearly a benefit to the City. Under the express terms of the take-over agreement, Tri-Met, as a successor to the City, receives the benefit of this provision. Tri-Met and the city of Portland stand in the identical position in regard to their relationship with Rose City and Landport.

### Urban Mass Transit Act of 1964

■ Throughout the franchise case the Companies consistently contend that the Urban Mass Transit Act of 1964 requires they be compensated for the going-concern value of their franchise. They maintain that "just compensation" must include going-concern value. The statutory provision relied upon by the Companies is 49 USC § 1602 (e) (1970):

> "No financial assistance shall be provided under this chapter to any State or local public body or agency thereof for the purpose, directly or indirectly, of acquiring any interest in, or purchasing any facilities or other property of, a private mass transportation company * * * unless * * * (3) just and adequate compensation will be paid to such companies for acquisition of their franchises or property to the extent required by applicable State or local laws * * *."

It is clear from the mere citation of this statute that Congress requires only that state and local law determine the amount of just and adequate compensation, not that there is overriding federal law as to "just compensation." This conclusion is adequately supported by both the relevant cases and the legislative history of the Act. *See South Suburban Safeway Lines, Inc. v. City of Chicago,* 416 F2d 535, 539 (7th Cir 1969); S Rep No. 82, 88th Cong, 1st Sess (1963). We have already concluded that Oregon law requires no compensation for "going-concern" value in this case so the federal statutory requirement has been met.

*The interest issue*

In the franchise case, on August 3, 1972, specific performance was decreed in favor of the City and Tri-Met as vendees against Rose City and Landport as vendors. It required Rose City and Landport to transfer and convey title to the assets involved to the City or its designate upon proper cash tender of what the court determined to be the fair value as of December 1, 1969, which sum was found to be $2,975,782.65, "without interest up to the date of this decree," August 3, 1972. Thus the City and Tri-Met had the use of the transit system from December 1, 1969, the take-over date, until August 3, 1972, without payment of purchase price, interest or rent.[9]

City and Tri-Met contend that it was proper not to allow interest because no provision was made for the payment of interest under the take-over agreement; that the bus system was obsolete; and that since

---

[9] By agreement possession of all the operating assets of the local transit system was transferred to the City from Rose City and Landport as of December 1, 1969. Thereafter, effective December 1, 1969, the City transferred possession to Tri-Met.

federal aid is not available to assist in paying interest, the impact on defendants would be severe. Defendants cite other benefits plaintiffs received, such as avoidance of the possibility of a bus strike, no longer being required to run a bus system or face the risk of such an operation, but plaintiffs urge that none of the benefits appear to be in any way commensurate with the rental of nearly $3,000,000 worth of traction equipment or interest on such amount of money.[8]

It is true that there was no contract between the parties expressly or impliedly covering interest, compensation or rental for the period after the transfer of possession. Both the franchise and the take-over agreement are silent on that subject.

It is a well-settled equitable principle that a purchaser in possession of property must pay compensation or rental in the form of interest on the purchase money until the money is paid, absent any express agreement to the contrary. *Bembridge v. Miller,* 235 Or 396, 408-11, 385 P2d 172 (1963), is a case in point. That case involved a declaratory relief and specific performance proceeding in equity brought by a seller against a buyer under an earnest money agreement covering the sale of real property, but silent as to interest. The buyer had been let into possession and retained possession during a lengthy period of title litigation and delayed performance by the buyer in obtaining mortgage financing to cover the

---

[8] The trial court noted that the City's tender of some $2,600,000 in 4 per cent revenue certificates, which was rejected by the plaintiffs, was inadequate as a tender and thus would not of itself affect liability for interest. This conclusion was not contested by defendants. One of the requirements of a valid tender is that it be for the full amount of the liability. Bembridge v. Miller, 235 Or 396, 403, 385 P2d 172 (1963).

purchase price. More than eight years elapsed between the earnest money agreement and the trial court decree. The trial court awarded interest to the seller on the unpaid purchase price for that entire period and until payment was tendered. The buyer appealed from that portion of the decree. The Supreme Court affirmed the trial court. It reviewed the theory of equity in awarding interest as follows:

"The theory of equity in awarding interest on the purchase price in the specific enforcement of a contract for the sale of land is governed by the peculiar character of the relation between vendor and purchaser. A type of reciprocal fiduciary relationship is created by the agreement. The purchaser acquires an equitable interest in the land and the vendor an equitable interest in the unpaid purchase price. Absent any stipulation to the contrary, the purchaser has a right to possession or the rents and profits of the land and the vendor a right to interest on the unpaid purchase price. The fruits of possession and the interest are mutually exclusive —there is no right upon the part of either to have both. *Hoehler v. McGlinchy,* 20 Or 360; *Sayre v. Mohney,* 30 Or 238, 47 P 197; *Burkhart v. Howard,* 14 Or 39 [Additional citations omitted].

"This court very early recognized the principle in *Hoehler v. McGlinchy,* supra. In finding the purchaser liable for the unpaid purchase price, the court said:

" 'The record presents the case of a plaintiff as vendor who has delivered the possession of his property to the defendant as a purchaser at the time, or near thereto, when the original contract was made, which the defendant has continued to enjoy without molestation ever since. Nor is this all: he has not only received the rents and profits, but has also held the purchase money. It is not equity that he should keep both, nor according to the ordinary course of business

transactions. Whatever labor he may have expended on the property was for his own benefit and to increase its value; and it sounds inequitable that he should enjoy the plaintiff's property during all this time for nothing. We think it is more equitable, after having been in the enjoyment of the estate, receiving its rents and profits, that the defendant should pay the interest.'" 235 Or at 408-09.

The court summed up the weight of authority as follows:

"* * * In the absence of some gross inequity, it seems to be the predominant weight of judicial opinion in courts of equitable jurisdiction that to accord the purchaser beneficial enjoyment of possession without liability for interest on the detained purchase money is inequitable." 235 Or at 410.

We conclude, therefore, that the trial court was in error in the present case in failing to allow to plaintiffs interest at the legal rate from the date of delivery of possession to the City and Tri-Met, December 1, 1969. In this respect the decree of the trial court is modified.

## II. THE PENSION CASE

*Factual background*

Although Rose City Transit and its predecessor companies operated under collective bargaining agreements with many of its workers for over 25 years, the first provision for a pension in such an agreement appeared in 1946.[⑨] Prior to that date all pensions were

---

[⑨] All agreements regarding pensions with which we are concerned herein are what are denominated noncontributory.

"Where the employer alone makes all contributions to the plan in addition to paying the employee his agreed wages or salary, the plan is called 'noncontributory.' * * *" Patterson, Legal Protection of Private Pension Expectations 15 (1960).

voted by the board of directors and were strictly controlled as to amount and frequency. Section 15 of the 1946 contract provided:

"Any employee with 20 years of service with the Company, who was actively employed on March 31, 1946 (or within three months thereof, if still carried on the payroll as an active employee) and who thereafter retires under Social Security Regulations, shall receive from the Company retirement pay of $20.00 per month, this provision to be in effect until the Company qualifies under the Railroad Retirement Act or a permanent retirement plan is adopted."

A substantially identical provision appeared in the one-year contract commencing April 1, 1947. The 1948 contract, however, contained somewhat different language:

"Par. 16. Any employe with twenty (20) years of service with the Company who was actively employed on March 31, 1946 (or within three (3) months thereof, if still carried on the payroll as an active employe) and who thereafter retires under Social Security regulations shall receive from the Company retirement pay of $40.00 per month. This retirement pay will not be granted to those employes who receive Railroad Retirement benefits."

The annual contract commencing April 1, 1949, again contained a somewhat different clause:

"Par. 16. Any employe with 20 years of service with the Company, who was actively employed on March 31, 1946 (or within three months thereof, if still carried on the payroll as an active employe), and who thereafter retires under Social Security or Railroad Retirement regulations, and whose total annuity under Social Security and/or Railroad Retirement is less than eighty ($80.00) dollars per month, shall receive from the Company retire-

ment pay sufficient to produce a total retirement annuity from Social Security, Railroad Retirement and the Company of eighty ($80.00) dollars per month. It is understood and agreed that no back pay shall accrue to any employe or ex-employe for any period prior to April 1, 1949."

The agreement of April 1, 1950, contained the identical clause except that the dollar amount provided was $100, and no right accrued to any employe prior to April 1, 1950. The contracts of 1951 and 1952 were identical in all respects with the contract of 1950.

The agreement of April 1, 1953, again altered the retirement provisions:

"Par. 13. (a) Any employe with 20 years of service with the Company who was actively employed on March 31, 1946 (or within three months thereof, if still carried on the payroll as an active employe), and who thereafter retires under Social Security and/or Railroad Retirement regulations, shall receive supplemental retirement pay from the Company in the amount of Sixty Dollars ($60.00) per month. This shall apply to employes in all operations of the Company except the Interurban System.

"(b) In the case of retired employes from the Interurban System the Company's contribution shall be in an amount that will produce a combined retirement benefit of $140.00 per month, including Railroad Retirement benefits.

"(c) These payments shall be due all retired persons now receiving retirement pay, effective in the above provided amounts, beginning with the month of April, 1953, and to persons subsequently retiring under Social Security or Railroad Retirement regulations.

"(d) It is understood and agreed that no back pay shall accrue to any employe or ex-employe for any period prior to April 1, 1953."

These provisions remained essentially unchanged through 1965. The only change of substance occurred in the 1954 agreement in which the employe was required to have 20 years or more of continuous service with the company. This requirement of continuity appeared in all subsequent contracts.

In 1956 Portland Traction, which had operated both the interurban and city lines, split into two divisions: Rose City Transit Co. a wholly owned subsidiary of Portland Traction and Portland Transit commenced operation of the city lines division, while Portland Traction continued operation of the interurban division. After 1956 all employes in the city lines division negotiated their contracts solely with Rose City Transit Co., while those employes working in the interurban division received benefits under the Railroad Retirement Act. The interurban contract with Portland Traction made no reference to retirement benefits. All labor contracts after 1956 with the Rose City Transit Co. contained no reference to Railroad Retirement.

The 1965 contract provided that all union employes retiring on or after November 1, 1965, would receive $65 per month in retirement benefits. The 1968 contract provided for two raises: Those retiring before November 1, 1965, received a 5 per cent raise effective November 1, 1968, and another raise in the same dollar amount on May 1, 1969. These two increases also applied to those employes retiring after November 1, 1965, who, under the 1965 agreement, were receiving $65 per month. Finally, the agreement of 1968 provided that employes retiring on or after November 1, 1968, would receive $150 per month in retirement pay. The 1968 contract also provided that the union and the

company would investigate a funded pension plan which would be discussed at the next labor contract negotiations. The 1968 contract contained standard provisions that no changes in the agreement providing for continuous service would operate to reduce the amount received by retired employes as of March 31, 1954, and that no back pay would accrue to any employe or ex-employe for any period prior to April 1, 1953.

All of the collective bargaining agreements between the union and the Companies provided, in one form or another, that if the franchise of the Companies terminated, the agreement would also terminate as of the date of cessation of operation by the company.

The City terminated the franchise in 1968 and litigation over the liability for retirement benefits was commenced on October 22, 1969. The City took over the possession of the system under the take-over agreement on December 1, 1969. On the same date, Tri-Met and Division 757, Amalgamated Transit Union entered into a memorandum agreement in which Tri-Met adopted all the terms and conditions of the working and wage agreement entered into previously by the union with Rose City. This agreement provided for some increases in hourly wage, but did not make any changes in retirement benefits. This agreement ran from December 1, 1969 through June 30, 1971. In October of 1971, the union and Tri-Met entered into another agreement, retroactive to July 1, 1971, in which various categories of retirement pay were provided. Paragraph 4 of Section 9 of that agreement provided:

"A declaratory judgment suit is pending in the Multnomah County Circuit Court * * * to deter-

mine the rights of Rose City Employees Retired, Rose City Employees Qualified, Rose City Employees and other former Rose City employees not covered by the Working and Wage Agreement, against and the liability of Rose City Transit Co., Landport Co., Inc., Portland Transit Co., and Charles C. Bowen for retirement and disability pay and for other benefits. The provisions of this agreement are without prejudice to the rights or position of any party to the declaratory judgment suit and are not a waiver or modification of any rights therein asserted."

On August 3, 1972, the trial court entered a decree in the retirement case, holding that Rose City and Landport were jointly and severally liable and had a continuing duty to make monthly pension payments to all retired union employes, to all retired non-union employes, and to all those union and non-union employes who were eligible to retire as of the date of the take-over by the City. Rose City and Landport were found not to have a duty, pro rata or otherwise, to provide pension payments to those employes, union and non-union, who were not eligible to retire as of the take-over date. Tri-Met and the City were found to be jointly and severally liable and to have a continuing duty to provide pension and disability benefits to all those employes who were not eligible to retire on November 30, 1969. The court also found that Rose City and Landport had no right of contribution from Tri-Met or the City as to the pension payments made or to be made to their former employes, and that Rose City and Landport did not have a duty to fund, accelerate, or otherwise provide in advance for the payment of any pension or disability benefit under which they were held liable. Both parties appeal from various portions of this decree.

*Urban Mass Transit Act of 1964*

 The Companies insist that the Urban Mass Transit Act of 1964 expressly provides that all obligations for pensions, for retired, eligible to retire and those not eligible to retire, must be assumed by the City and Tri-Met. The statutory provision relied upon is 49 USC § 1609 (c) (1970):

"It shall be a condition of any assistance under section 1602 of this title that fair and equitable arrangements are made, as determined by the Secretary of Labor, to protect the interests of employees affected by such assistance. Such protective arrangements shall include, without being limited to, such provisions as may be necessary for (1) the preservation of rights, privileges, and benefits (*including continuation of pension rights and benefits*) under existing collective bargaining agreements or otherwise; (2) the continuation of collective bargaining rights; (3) the protection of individual employees against a worsening of their positions with respect to their employment; (4) assurances of employment to employees of acquired mass transportation systems and priority of reemployment of employees terminated or laid off; and (5) paid training or retraining programs. Such arrangements shall include provisions protecting individual employees against a worsening of their positions with respect to their employment which shall in no event provide benefits less than those established pursuant to * * * this title. The contract for the granting of any such assistance shall specify the terms and conditions of the protective arrangements." (Emphasis supplied.)

The relevant cases and the legislative history support the conclusion that pension matters are strictly for the Secretary of Labor to decide, and that, in any event, the statutory provision is intended to be worker-protective, not company-protective. *See Kendler v.*

*Wirtz*, 388 F2d 381, 384 (3d Cir 1968); S Rep No. 82, supra at 28; 2 US Code Cong & Ad News 2583-85 (1964). We conclude that the Act was not intended to relieve the Companies of any pension liabilities that they might have incurred.

### *Oregon Constitution and statutes*

### *A. The applicable provisions*

The Companies place considerable reliance upon a provision of the Oregon Constitution and upon statutory provisions which they argue serve to shift any pension obligations of the Companies to the City and Tri-Met. The constitutional provision in question is § 13 of Art XI:[®]

> "Notwithstanding the provisions of section 20, Article I, section 10, Article VI, and sections 2 and 9, Article XI, of this Constitution, when any city, county, political subdivision, public agency or municipal corporation assumes responsibility for the operation of a public transportation system, the city, county, political subdivision, public agency or municipal corporation shall make fair and equitable arrangements to protect the interests of employes and retired employes affected. Such protective arrangements may include, without being limited to, such provisions as may be necessary for the preservation of rights, privileges and benefits (including continuation of pension rights and payment of benefits) under existing collective bargaining agreements, or otherwise."

ORS 267.235 has similar provisions:

> "When the district acquires an operating public transportation system, it shall make fair and equitable arrangements to protect the interests of em-

---

[®] Created through HJR 13, 1965, adopted by the people November 8, 1966.

ployes and retired employes of the system. Such protective arrangements shall include, but shall not be limited to:

"(1) Preservation of rights, privileges and benefits, including continuation of pension rights and payment of benefits, existing under collective bargaining agreements, or otherwise;

"(2) Continuation of collective bargaining rights;

"(3) Protection of individual employes against a worsening of their positions with respect to their employment; and

"(4) Assurance of employment to persons employed by the mass transportation system acquired and priority of reemployment to persons previously employed."

ORS 237.015 states:

"Notwithstanding other provisions of law to the contrary, when a public employer who is participating in the Public Employes' Retirement System assumes responsibility for the operation of a public transportation system under section 13, Article XI, of the Oregon Constitution, that employer may exclude from membership in the Public Employes' Retirement System all employes, or any class of employes, of the public transportation system."

While there are inconsistencies, we find that the legislative history of these provisions, taken as a whole, indicates that they were enacted to enable the city of Portland to receive funds under the Urban Mass Transit Act and were not intended to relieve the Companies from any pension obligations.

*B. Legislative history*

*1. Constitutional amendment*

■ The constitutional amendment was introduced in

1965 as House Joint Resolution 13. The original version of HJR 13 contained five subsections, worded identically to 49 USC § 1609 (c), subsections (1) through (5), set out above. Amendments to the resolution deleted all of the five subsections except subsection (1). Testimony and statements concerning the resolution in both houses of the legislature indicate that the primary purpose of the amendment was to permit the city of Portland to receive funds under the Urban Mass Transit Act. *See* Minutes, House Judiciary Committee, March 19, 1965 at 2; Minutes, Senate State and Federal Affairs Committee, April 20, 1965 at 6; Tapes, floor debate, HJR 13, H R, April 8, 1965, Oregon State Archives. While there is some testimony concerning possible assumption of the Companies' pension obligations by the City, we find that these statements are merely incidental to the primary purpose of qualification for federal funds. There was no intent to state that the City *must* take over the pension obligations of the Companies; a more consistent reading of the amendment is that the City and Tri-Met *may* take over these pension obligations if necessary.

### 2. ORS 267.235

■ The language of ORS 267.235 appears in the originally introduced form of House Bill 1808, ultimately enacted as Oregon Laws 1969, ch 643. As introduced, the portion of HB 1808 referring to pension rights had the identical wording as 49 USC § 1609 (c), subsections (1) through (4), set out above; subsection (5) had been deleted. There was no change in this section of the bill as introduced and no testimony or floor discussion that aids the court's inquiry in any way. We conclude that this statute, in conjunction with the constitutional amendment, was intended only to enable

the city of Portland to receive federal funds under the Urban Mass Transit Act.

### 3. *ORS 237.015*

■ This statute originated from House Bill 1438, enacted as Oregon Laws 1969, ch 54. The testimony on this bill exhibits inconsistencies with some witnesses indicating that the city of Portland would be obligated to take over any pension obligations of the Companies. However, we find that the basic purpose of this statutory provision relates to the Urban Mass Transit Act, as indicated by several witnesses. *See* Minutes, House Committee on Urban Affairs, March 4, 1969; Minutes, Senate Labor and Industries Committee, March 17, 1969 at 1. The evident purpose of the statute was to bring the constitutional provisions and the existing Public Employes' Retirement provisions into harmony should it be required that the City take over any pension obligations of the Companies; otherwise, Urban Mass Transit funds would be jeopardized.

In sum, we find no intent in § 13, Art XI of the Oregon Constitution, ORS 267.235 or 237.015 to transfer any pension obligations from the Companies to the City. We must look to the agreements themselves to find who has the continuing obligation to pay pensions.

*Retired and eligible-to-retire union employes*

■ *A. Vesting*

The trial court found that under the collective bargaining agreements entered into with the unions the Companies had a continuing pension liability to those union employes who had retired or who were eligible to retire.

The record demonstrates that the pensions of retired employes were not funded but were paid during each year out of current operating revenues. The Companies argue that this lack of funding evidenced and was a recognition that there was to be no future continuing liability and thus no vesting of the pension benefits. The terms "vested" and "funded" must not be confused:

> "The term 'vesting' may be used in a broad sense to indicate any combination of circumstances which, by the terms of the plan, gives a covered employee a nonforfeitable right to benefits payable from all contributions attributable to him or to his service. * * *" Patterson, Legal Protection of Private Pension Expectations 60 (1960).

> "A 'funded' plan is one pursuant to which contributions for current (and past) service are regularly transferred to a third person (trustee or insurer) who is to accumulate a fund as a source of payment to each employee at and after his retirement. An unfunded plan is one in which the employer does not set aside any segregated assets for the payment of retirement income, even though it may adopt a bookkeeping device to indicate its accumulation of surplus for that purpose." Patterson, supra at 15.

The question of vesting must be considered apart from any provisions made by the Companies to fund their obligations.

*McHorse v. Portland General Electric,* 268 Or 323, 521 P2d 315 (1974), the Supreme Court discussed the defendant's long-term disability income plan which the company had unilaterally terminated:

> "* * * [I]n the situation where the employee has satisfied all conditions precedent to becoming eligible for benefits under a plan, the better rea-

soned view is that the employee has a vested right to the benefits. * * *" 268 Or 331.

Similarly, in *Vallejo v. American R. Co. of Porto Rico,* 188 F2d 513 (1st Cir 1951), wherein the collective bargaining agreement obligated the company to maintain a system of retirement with a pension, the court stated:

"* * * It is only consistent to hold that the obligation runs to each employee who qualifies through age and service and not that the company was obliged merely to maintain a pension system and no more. * * *

"To give meaning to this obligatory pension system, the appellants must be considered qualified and entitled to pensions upon satisfying the requirements as to age and service. [Citations omitted.]" 188 F2d at 516.

·*See* Annotation, 42 ALR2d 461, 475 (1955) ; Patterson, supra at 60.

We find that those union employes meeting the required age and service conditions for retirement do have a vested right to their pensions. The next question raised by the Companies, however, is whether this right, vested or otherwise, extends beyond the term of the bargaining agreement.

### B. *Continuity of benefits*

█ The Companies earnestly contend that retirement benefits provided by the contract do not extend past the termination date of said contract. We conclude that in this case the benefits to the retired and eligible-to-retire employes do, in fact, extend beyond the final date of the contract. This conclusion, we believe, is supported by the terms of the contracts themselves, by relevant case law, and by various items of extrinsic evidence.

### 1. *Terms of the contracts*

The contracts themselves repeatedly speak in terms of "retirement" pay.[*] The normal interpretation one would give to such a provision is that the pay will continue during the retirement of the individual involved. For example, in *New York City Omnibus Corp. v. Quill,* 189 Misc 892, 73 NYS2d 289 (1947), *aff'd as modified* 272 App Div 1015, 74 NYS2d 925 (1947), *aff'd* 297 NY 832, 78 NE2d 859 (1948), the court concluded at 73 NYS2d at 293:

> "* * * [A] commitment 'for the lives of the employees' pensioned * * * is the normal and ordinary meaning of a pension plan for employees, unless some other intent is mistakenly specified. * * *
>
> "The conclusion at which I have arrived is also in accord with the prevalent public conception of what is contemplated by a pension system. * * *'"

Likewise, in *Broadhurst v. Fall River,* 278 Mass 167, 169, 179 NE 586 (1932), the court stated:

> "* * * A pension is definite in amount, [and] lasts during the life of the pensioner * * *."

Finally, Patterson, supra at 3 notes:

> "A pension plan is one that provides for the payment to retired employees of sums of money periodically throughout the life of the employee."

*See also,* Treas Reg § 1.401-1 (b) (1) (i) (1972).

The Companies cite various cases which they contend support the position that pension rights cannot extend beyond the term of the contract. *See Local 586,*

---

[*] At oral argument, counsel for the Companies stated in response to a question that he felt there was no legal difference between a pension plan and a retirement plan. We will use the two terms interchangeably.

*UAW, CIO v. Federal Pacific Electric Co.*, 28 CCH Lab Cas 89, 187-188, ¶ 69,274 (D Conn 1955); *Hauser v. Farwell, Ozmun, Kirk & Company*, 299 F Supp 387 (D Minn 1969). However, there was no discussion of vested pension rights in *Local 586* and in *Hauser* the court found that rights *vested* under the contract *would* continue past the closing of the business of a company.

*Owens v. Press Publishing Co.*, 20 NJ 537, 120 A2d 442 (1956), which involved a suit by discharged employes against an employer to recover severance pay allegedly due under an expired collective bargaining agreement, correctly sets forth the status of vested pension rights. The court held that severance pay was a form of compensation and thus survived the agreement:

> "Of course, the right to such pay can 'arise' only during the subsistence of the contract so providing, and not after its termination; but once the right thus comes into being it will survive the termination of the agreement. * * *" 20 NJ at 548.

*See also, Brooklyn Eagle, Inc.*, 32 Lab Arb 156 (1959). A similar result was reached in *International U., U.A., A. & A. Imp. Wkrs. v. Defiance Indus., Inc.*, 251 F Supp 650, 653-54 (ND Ohio 1966):

> "It is generally recognized that the axiom of contract law that parties to an agreement are relieved of their mutual obligations upon completion of the contract is not fully applicable to collective bargaining agreements. For instance, severance pay, vacation pay, and pension rights may survive the collective bargaining agreement. The employees are deemed to have earned deferred compensation during the term of the contract. As a result, the company's obligation of payment often extends well beyond the termination date."

In sum, we conclude that rights once vested may not

be lost by the employe when his collective bargaining agreement expires.[10]

## 2. Extrinsic evidence

The parties introduced extrinsic evidence that supported both points of view in this controversy.[11] Reviewing the mass of evidence produced would not be particularly useful. However, we take particular

---

[10] The Companies claim that the union bargained away certain of these rights of the employes. We note that if in fact these rights were bargained away, the change could be of no force or effect. Under established contract principles, vested retirement rights may not be altered without the pensioner's consent. Chemical Workers v. Pittsburgh Glass, 404 US 157, 92 S Ct 383, 30 L Ed 2d 341 (1971). Moreover, a close examination of the contracts themselves reflects that any changes in the rights of retired workers were in accordance with the contract. For example, the 1946 contract referred to retirement under the Railroad Retirement plan and indicated that retirement under that plan would alter any temporary pension system. This does not diminish the vested pension rights of these workers, but rather provides for alternative pension arrangements.

The Companies further contend that the bargaining demands of the unions in 1968, which referred to payment of pension for the life of the employe and, following his death, a reduced pension to his wife, are an admission that these payments were not for life. We do not agree that the proposed change affects the continuity of the pension; rather, it provides alternatives and additional coverage. In International U., U.A., A. & A. I. W. v. Anaconda Am. Brass Co., 475 F2d 682 (6th Cir 1973), the court held that an effort by a union to effect a clarification of disputed language is not a waiver of its position as to the meaning of the language in dispute. The record in the present case indicates that the union, since 1961, had faced increasing company resistance to the idea that these pensions were, in fact, for life. Any suggested change in 1968, apart from the additional benefits sought by the union, should be seen as an attempt to clarify the pension rights, not as an admission that the pension was not for life.

[11] Mention should be made of the contention of the Companies that all dealings between the union and Portland Traction prior to the take-over by Rose City Transit in 1956 are immaterial. We do not agree. The facts amply demonstrate that Portland Traction, Rose City Transit Co., and Landport are all wholly owned subsidiaries of the Portland Transit Co. Furthermore, upon the trans-

note of Exhibit 16 which includes a Rose City official's forecast of the total pension payments that would have to be made by the company for ten-year periods in the future; these reports covered periods extending beyond both the current labor contract and franchise term. This suggests that the company believed that these obligations did not expire with the termination of the working agreement.

Also of importance is the way the parties themselves performed under the agreement. As noted, supra, Portland Traction split into two divisions in 1956: Rose City Transit, which took over the city lines, and Portland Traction, which continued the interurban division. The interurban employes did not have a contract with Portland Traction after 1956 that provided for retirement benefits. Yet Rose City continued making payments to the retired employes of Portland Traction after the expiration of the 1954-56 agreement. The practical interpretation is often of dispositive importance in determining the intent and purposes of the obligation incurred by the parties. *N.L.R.B. v. Universal Services, Inc. and Associates,* 467 F2d 579, 585 (9th Cir 1972); *see,* 3 Corbin, Contracts 249-62, § 558

---

fer of the assets from Portland Traction to Rose City, Rose City took over all the operations and employes of Portland Traction. Rose City notified the employes that it would pay them on the same terms and conditions as had been paid by Portland Traction and the labor contracts thereafter executed between Rose City and the union are identical with the contracts executed before 1956, except that all references to interurban employes were deleted. Moreover, the stipulation introduced into evidence stated that the employes receiving pension benefits were former employes of Portland Traction or Rose City, acknowledged that pension and disability payments made by Rose City or Portland Traction were treated as monthly operating expenses, and made other references to certain acts and representations of Portland Traction. Consideration of *all* dealings since 1946 was proper.

(1960). *See also, Perkins v. Standard Oil Co.*, 235 Or 7, 15, 383 P2d 107, 383 P2d 1002 (1963).

We conclude that, taking the normal meaning of the word "retirement," the extrinsic evidence and the cases on the subject, retirement benefits do extend beyond the expiration date of the collective bargaining agreement. All those persons who meet the age and service requirements of the contract and thus have a vested right in a pension must be paid by the Companies as ordered by the trial court. The trial court's ruling was correct.

*Non-union retired employes and those eligible to retire*

■ The trial court held that non-union retired employes or non-union employes eligible to retire were entitled to pension benefits to be paid by the Companies on the basis of an enforceable unilateral contract. The Companies assert that there was no unilateral contract proved. The Companies concede that when an employer (1) adopts a plan to pay retirement benefits and (2) the employes know of the plan and (3) continue their employment until they become eligible for benefits under the plan, the trend of modern decisions has been to find a contract to pay benefits either under what is termed a deferred compensation theory or under a unilateral contract theory. However, the Companies assert that where there was no plan but merely the payment of a sum at the time of retirement, and where there is no showing that the employes knew of the "plan" and continued their employment in reliance on the "plan," there is no legal liability on the part of the employer to pay retirement benefits. The Companies then claim in the present case that there was a failure

of proof, i.e., that no non-union retirees or "eligible" non-union employes testified at the trial and

"* * * [t]here was not one item of evidence remotely suggesting that officials of Portland Traction or Rose City ever made even one representation to a single non-union employee that he would be paid a retirement benefit if he were to follow a particular course of action in the future. Nor was there any evidence that any individual employee knew or understood there was a plan which would confer a retirement benefit upon him should he comply with certain conditions such as continued employment."

The City and Tri-Met point to no evidence of non-union employes' knowledge or reliance[20] but argue that:

"* * * [I]f an employer follows a consistent pattern of paying pensions to employees, the employees' right to such payment vests upon compliance with the terms of the offer."

City and Tri-Met cite six cases in support of this proposition,[21] but in each of the cases cited there was a showing that there was a plan or course of performance and that the employes knew of such plan. None of the cases cited negative the requirement that to support the City's and Tri-Met's contention there must be evidence in the record that there was in fact a

---

[20] One former non-union employe who had been promoted to a high management position testified that he was aware of the payment of pensions to retired non-union employes. There is no indication in the record whether he obtained this knowledge prior to becoming part of management or that he in any way relied thereon. At the time of this proceeding he was not a member of the class of non-union employes involved in the litigation.

[21] Thompson v. Burr, 260 Or 329, 490 P2d 157 (1971); McLemore v. Western Union Tel. Co., 88 Or 228, 171 P 390, 171 P 1049 (1918); Bird v. Connecticut Power Co., 144 Conn 456, 133 A2d 894 (1957); Sheehy v. Seilon, Inc., 10 Ohio St 2d 242, 39 Ohio Op 2d 374, 227 NE2d 229 (1967); Cantor v. Ins. Co., 171 Ohio St 405, 14 Ohio Op 2d 157, 171 NE2d 518 (1960); Parsley v. Wyoming Automotive Company, 395 P2d 291 (Wyo 1964).

pension plan and that the employe concerned knew of the plan.

The generally applicable law is stated in Patterson, supra at 12:

" 'Private pension plans' includes all consensual arrangements *made in advance* of old age for payments or other benefits conditional upon the payee's attaining an advanced age. It excludes payments not made pursuant to a plan created *in advance,* e.g., it excludes an employer's gratuitous promise, made only at or after the time of retirement, to pay an employee a pension for life. Without more, such gratuitous undertakings have been held not to be legally enforceable because of the absence of consideration, that is, something *presently* bargained for by the employer. * * *" (Emphasis Patterson's.)

Most courts require some manifestation of, or at least acknowledgment of, the existence of such a plan by the employe. For example, in *Molumby v. Shapleigh Hardware Company,* 395 SW2d 221, 226 (Mo Ct App 1965), while discussing a non-contributory pension plan, the court concluded:

"For such plans to become enforceable contracts the courts have required notification to and knowledge of the benefits on the part of the employee and consideration or continuance of employment in reliance upon the plan. * * *"

Likewise, in *Parnas v. Universal-Engel Paper Box Company,* 333 SW2d 316 (Mo Ct App 1960), the court found that a pension paid on a board of directors' resolution in recognition of past, faithful service was without consideration and was a mere gratuity since there was no mutuality of contract; the court required some action or forbearance in order to invoke promissory estoppel against the company. *Accord, Perreault v.*

*Hall,* 94 NH 191, 49 A2d 812 (1946); *Plowman v. Indian Refining Co.,* 20 F Supp 1 (ED Ill 1937). *See Parsley v. Wyoming Automotive Company,* 395 P2d 291 (Wyo 1964). *Cf., Harryman v. Roseburg Fire Dist.,* 244 Or 631, 420 P2d 51 (1966).

Since all the payments to the non-union employes were by virtue of a resolution of the board of directors and there was no testimony by any non-union employe, or other evidence, that he knew about or relied upon such future payments by the board of directors, the unilateral contract theory adopted by the trial judge is without support. We reverse this portion of the trial court's decree.

■ *Union and non-union employes not eligible to retire at the date of the take-over*

The court below ruled that the Companies had no obligation to those employes who were not eligible to retire at the date of the take-over. In *McHorse v. Portland General Electric,* supra, the court found that where the employe has satisfied all conditions precedent to becoming eligible under a plan, he has a vested right to the benefits. 268 Or at 331. The court continued that benefits under a pension plan are

> "* * * paid upon the employee's having satisfied certain eligibility requirements as conditions precedent to such payout. * * *" 268 Or at 334.

*See also, Taylor v. Mult. Dep. Sher. Ret. Bd.,* 265 Or 445, 451, 510 P2d 339, 342 (1973), where the court noted that rights rising under a pension plan are subject to the completion of the necessary service. *Accord, Vallejo v. American R. Co. of Porto Rico,* supra at 516; Annotation, 42 ALR2d 461 (1955); *Fifth Avenue Coach Lines, Inc.,* 39 Lab Arb 1171 (1963).

■ The City and Tri-Met apparently agree that the collective bargaining agreement itself does not vest any rights before the necessary age and service requirements are met, but they argue that, in spite of the terms of the agreement, a deferred compensation theory should be applied to create a pro rata obligation of the Companies to pay pension benefits.[9] They contend that the employers theoretically set aside a certain amount each year by way of reduced pay and that this amount

[9] Rights of employes under a collective bargaining agreement are derived from that agreement and the principles of bilateral contracts apply. *See* Aaron, Legal Status of Employee Benefit Rights under Private Pension Plans 15 (1961). Where there is no such bilateral agreement, courts generally turn to one of two theories to support vesting of pension rights.

The first theory, adopted by an increasing number of courts, holds that pension plans give rise to contractual obligations binding upon the employer. The pension plan embodies an offer by the employer to enter into a unilateral contract to pay a pension which the employe accepts by remaining continuously on the job and rendering faithful service for the requisite period. In applying this theory courts place great weight on the fact that the employes either knew in general terms of the existence of a plan or had detailed information concerning it and continued their employment in reliance upon the promise of a plan.

The second theory is a variant of the contract theory and holds that the benefits promised under a private pension plan are deferred compensation. This theory is derived from the fact that many labor negotiations include pensions as specific points in wage negotiations. Consideration for the employer's promise is found in the daily work of the employe. While the legal effects of the unilateral contract and deferred compensation theories of private pensions are similar, the time when they become enforceable is different. Under the unilateral contract theory the employe's pension rights do not become enforceable until he has reached the required age and service set forth in the offer. Under the deferred compensation theory he can successfully assert his claim as soon as he has earned the amount contributed or set aside for his benefit, even, in some cases, where a bilateral contract has been formed.

For a general discussion of the various approaches, *see* Aaron, supra; Note, *Pension Plans and The Rights of The Retired Worker,* 70 Colum L Rev 909 (1970); Note, *A Reappraisal of the Private Pension System,* 57 Cornell L Rev 278 (1972).

represents deferred compensation in which they have a vested interest. In support of this contention they cite *Lucas v. Seagrave Corporation,* 277 F Supp 338 (D Minn 1967), wherein the court, on the basis of deferred compensation, found that the employes of the company who were not yet eligible to retire had a restitutionary remedy *in quantum meruit* for the labor given for compensation at less than the actual value of such service, in reliance on the plan.

Washington courts, which adopt the deferred compensation theory in non-bilateral contract situations, take a different view from the court in *Lucas.* For example, in *Jacoby v. Grays Harbor Chair & Mfg.,* 77 Wash2d 911, 920-21, 468 P2d 666 (1970), the court concluded:

> "It may seem unfair to declare a pension plan to be compensation and then deny an employee who is not at fault the fruits of this compensation. But the extent of this compensation is limited by the terms of the contract [between the company and the insurance carrier], and many cases have held that an employee who is not at fault but who does not fall within the contractual requirements may not recover pension benefits. * * *"

*See also,* Annotation, 42 ALR2d 461 (1955).

Thus it seems that even under the deferred compensation theory, some courts have held that the employe has no rights under the plan until he has satisfied the age and service requirements.

We need not reach this question, however, for Oregon has not definitively adopted the deferred compensation theory under any circumstances. Both *McHorse v. Portland General Electric,* supra, and *Taylor v. Mult. Dep. Sher. Ret. Bd.,* supra, suggest that the

Supreme Court is leaning toward the unilateral contract theory where there is no collective bargaining agreement. Where a collective bargaining agreement does exist, the court has given no indication that it will not follow the specific eligibility provisions of that agreement. Those employes who have not met the age and service requirements have no vested rights in a pension and the Companies are not pro rata liable for the payment of these pensions.[15]

*Commercial frustration and impossibility argument*

■ The Companies contend that since the pension plan was non-funded and that the only funds available to pay for it came out of the fare box, when the City and Tri-Met took over the fare box the Companies' ability to make pension payments was rendered impossible. This argument is without merit.

"* * * [T]he doctrines of impossibility and frustration involve the allocation of risks of unexpected occurrences which make the performance of contractual duties more burdensome than originally contemplated. * * * If the occurrence is reasonably foreseeable, courts normally take the position that the promisor has assumed the risk of impossibility or frustration. * * *" Calamari and Perillo, Contracts 316, § 198 (hornbook series 1970).

*See* Restatement, II Contracts 849, § 457 (1932), adopted in *Savage v. Peter Kiewit Sons'*, 249 Or 147, 152, 432 P2d 519, 437 P2d 487 (1968). *See also, H. Krementz Drayage Service*, 31 Lab Arb 436 (1958), in

---

[15] The various non-union employes are not covered by the collective bargaining agreement so the theories discussed in n 14, supra, apply to their situation with regard to pro rata vesting. However, even the adoption of a deferred compensation theory would not suffice to cover them in this case since there was no testimony that any of these workers knew of a plan, accepted a reduction in pay in exchange for a future pension, or otherwise relied upon the Companies' payment of pensions.

which the employer's financial inability to pay was no defense to the union's claim for back payments admittedly due for pensions and vacation pay.

In the case at bar, as repeatedly emphasized in their brief, the Companies believed that the franchise was subject to termination at any moment. This uncertainty was present during every collective bargaining session with the employes and the Companies had ample opportunity to write a provision into the agreement that the obligations to retired persons would extend only for the term of the contract or the period of operation. The statements made by the Companies in their brief clearly support the conclusion that they assumed the risk that the franchise would be terminated.

### Tri-Met-union contract

■ The Companies contend that when Tri-Met entered into its first collective bargaining agreement with the union, which fully incorporated all the provisions of the prior collective bargaining agreement between Rose City and the union, Tri-Met became liable thereunder for all pension benefits.

The effect of the collective bargaining agreement between Tri-Met and the union was to make Tri-Met liable for pension benefits of all employes retiring under that agreement and not eligible to retire prior to the date of the take-over. As above concluded, there was no obligation (except a secondary obligation as hereinafter pointed out) on the part of Tri-Met to pay those union employes who had already retired or were eligible to retire and the mere entering into the collective bargaining agreement incorporating the language of a prior collective bargaining agreement with

Rose City cannot serve to shift the obligation from Rose City to Tri-Met.

### Contribution by the City

The Companies contend that the City and Tri-Met must contribute to their liability for the pensions due the retired and eligible-to-retire union workers. As defined in 18 Am Jur2d 6, Contributions § 1:

> "The principle or doctrine of contribution is one of equality in bearing a common burden. Contribution has been defined as a payment made by each person, or by any of several persons, having a common interest or liability, of his share in the loss suffered or in the money necessarily paid by one of the parties in behalf of the others. The right of contribution has also been variously described * * * as an equity which arises when one of the several parties liable on a common debt discharges the obligation for the benefit of all." (Footnotes omitted.)

See also, Mansfield v. McReary, 263 Or 41, 497 P2d 654, 501 P2d 69 (1972).

■■ For the doctrine of contribution to apply, however, there must be a common debt by persons having a common liability. The City's liability is only secondary or that of a guarantor, and, thus, its liability is not common with that of the Companies'.[9] In the absence of such common liability, the doctrine of contribution has no applicability.

### Amount of monthly benefits

■ The trial court, in its decree, fixed the disputed retirement and disability liability as the monthly amounts being paid as of November 30, 1969. The

---

[9] See discussion infra, pp 428-30 (Primary obligation of the City and Tri-Met).

Companies contend that the monthly benefit level of each former employe cannot exceed that in effect at the time of his actual retirement, and, in any event, cannot exceed the amount in effect when he became eligible to retire.

The employes were covered by the last working agreement between Rose City and the union effective November 1, 1968. The retirement benefits paid under that agreement are the ones that should control. Under Paragraph 12 of that agreement all those employes who retired before November 1, 1965 would receive $60 per month until November 1, 1968, when the pay would be increased to $63 per month and then increased to $66 per month on May 1, 1969. All those retiring on or after November 1, 1965 would receive $65 per month until November 1, 1968, at which time the benefit would increase to $68.25 until May 1, 1969, whereupon the amount paid would increase to $71.50 per month. All employes retiring on or after November 1, 1968 would receive $150 per month retirement pay. This was the trial court's determination and we affirm it.

The other contentions raised by the Companies in their appeal are without merit and need not be discussed here.

*Cross-appeal by the City and Tri-Met*

*Acceleration of the liability*

 The City and Tri-Met contend that the trial court erred by not requiring Rose City and Landport to fund the pension requirement upon receipt of the monies from the take-over of the system. They urge that the amount due be accelerated. Acceleration is a remedy used where there has been an anticipatory re-

pudiation or breach or a possibility of a future breach. There has been no breach by the Companies in the past and no reason to suspect a breach in the future. The Companies met all their pension obligations up to the time of the take-over agreement, at which time the City agreed to undertake these obligations pending the outcome of this suit. While the Companies have actively contested their continuing liability, there is no reason to suspect they will not meet such obligation.

All the cases cited by the City and Tri-Met involve breach or anticipatory breach situations. The more analogous situation to the one presented in this case appears in *Rishmiller v. Prudential Ins. Co.*, 192 Minn 348, 256 NW 187 (1934), wherein the company denied that there had arisen a condition under which it was obligated to pay as provided in the disability clause of its contract; the company did not repudiate its contract or question the entire validity of its contract. The court concluded:

> "* * * [I]n this case there was no such absolute and unqualified repudiation of the contract as is required to put into effect the rule in regard to anticipatory breach. * * * Nor might the plaintiff recover the present value of future monthly indemnity for what he chooses to call normal breach. * * * Defendant's obligation was merely to pay certain sums of money on certain dates as long as plaintiff lived or suffered the disability. Such a situation does not give plaintiff the right to the present value of future payments. He must await the due dates. * * * 'A mere refusal to pay money when due, especially a refusal based upon the terms of the contract and in good faith although mistakenly believed to be justified by it, is not a repudiation of the contract * * *.' [Citations omitted.]" 192 Minn at 353.

*Accord, Benefit Trust Life Insurance Company v.
Baker,* 487 SW2d 406 (Tex Civ App 1972) ; *Mutual Life
Insurance Co. v. Marsh,* 186 Ark 861, 56 SW2d 433
(1933). *See also, Williams v. Stockman's Life Ins.,*
250 Or 160, 172, 441 P2d 608 (1968).

The facts of this case do not suggest a breach,
but rather indicate that the company was seeking a
judicial determination of its obligations under the
contract while making payments when due (until the
City take-over). Under the circumstances, acceleration
would not be proper.[9]

*Primary obligation of the City and Tri-Met*

■ The parties on both sides of this controversy
apparently interpret the trial court's order to mean
that the City and Tri-Met are primarily liable with
Rose City and Landport for the payment of pensions
to those union and non-union employes who are retired
or eligible to retire. The City argues that such primary
liability is improper and that the City and Tri-Met
are only secondarily liable, while the Companies argue
that since the City and Tri-Met are primarily liable
they must contribute to the payment of these obliga-
tions. In its pertinent parts, the decree in the retire-
ment case states:

"10. Tri-Met and City are jointly and severally
liable for pension and disability payments to those
former employees of Rose City and Landport * * *
who have retired or are disabled or who were
eligible for retirement as of November 30, 1969, in
amounts not less than the monthly amounts such

---

[9] ORS 659.320 provides that if an employer has entered into a
collective bargaining agreement providing for pension benefit pay-
ments, it shall be unlawful and punishable by fine and imprison-
ment for such employer to wilfully or with intent to defraud fail to
make such payments.

employees were being paid or entitled to be paid as of November 30, 1969.

"11. Rose City and Landport have no right of contribution from Tri-Met or City as to pension payments made or to be made by Rose City or Landport to their former employees."

Taking this portion of the decree together with the written opinion in the retirement case, it appears the trial court did not intend that Tri-Met and the City be primarily liable for these payments. The reference to joint and several liability, in our opinion, refers only to the liability of the City and Tri-Met *inter se*. It does not reflect the liability of the City and Tri-Met in relation to Landport and Rose City. The opinion by the trial judge clearly indicates that Rose City and Landport are primarily responsible for the payment of these retirement benefits. Also, the court's rejection of any contribution indicates that it did not feel that the City and Tri-Met were co-obligors with Rose City and Landport. Rather, it seems clear that the court intended that Tri-Met and the City be guarantors of the payment of the pension benefits to those who were retired or eligible to retire as of the date of the takeover. This conclusion renders Rose City and Landport primarily liable and the City and Tri-Met secondarily liable for these pension benefits.[9]

In conclusion we affirm the decree in the franchise case except that portion of the decree denying the Companies' claim to interest, which we reverse. In

---

[9] We note that the Oregon constitutional and statutory provisions discussed supra in no way require that the obligation of the City and Tri-Met be primary, but only that they make provisions for the continuation of the existing pension plans. The assumption of secondary liability by the City and Tri-Met would fulfill these requirements. This is also all that is required by the Urban Mass Transit Act of 1964.

the pension case we affirm the decree except that portion allowing pension benefits to non-union employes, which is reversed.

Affirmed in part; modified and reversed in part and remanded for the entry of a new decree consistent with this opinion. Costs to neither party.

FORT, J., concurring in part, dissenting in part.

The opinion of the court concludes that there was insufficient evidence to support the finding and conclusion of the trial court respecting the obligation of the companies to pay pensions to non-union employes. This conclusion is based in major part on the failure of any non-union employe to testify that he knew of a company plan to pay pensions and relied on it. While I agree such testimony would have aided their claim, it seems to me the trial court's finding is supported not only by the testimony set forth in n 12, but also by the further fact that *every* non-union employe who reached retirement age while still an employe was awarded a pension by the board of directors, if he otherwise met the length of service standards. I think it was a reasonable inference for the trial court to conclude both that the non-union employes were fully aware of every such action by the board of directors, and that in continuing their employment, they came to rely upon that long-continued practice well before the termination of the franchise. This uniform practice had continued for 22 years. This seems to me to be particularly true where the union employes, as the majority points out, were throughout the period working under a contract which provided for the payment by the companies of pensions to those of its members who qualified thereunder.

Accordingly, I conclude that in the pension case, the decree of the trial court should be affirmed as to both the union and the non-union employes. In all other respects, I concur in the opinion of the court.