Argued and submitted January 30, affirmed on appeal and cross-appeal
October 15, 1997

Frank L. NEWELL,
*Respondent - Cross-Appellant,*

*v.*

James M. WESTON,
*Appellant - Cross-Respondent,*

*and*

NORTH PACIFIC INSURANCE COMPANY,
*Defendant.*

James M. WESTON,
*Third-Party Plaintiff,*

*v.*

NORTHWEST PUMP & EQUIPMENT COMPANY,
*Third-Party Defendant.*

(9212-08470; CA A89561)

946 P2d 691

Daniel E. O'Leary argued the cause for appellant - cross-respondent. With him on the briefs were Darleen Darnall, Davis Wright Tremaine, Norman L. Lindstedt and Lindstedt & Buono, P.C.

Paul R. Duden argued the cause for respondent - cross-appellant. With him on the briefs were Michael J. Gentry and Tooze Shenker Duden Creamer Frank & Hutchison.

Before Riggs, Presiding Judge, and Landau and Leeson, Judges.

LANDAU, J.

## LANDAU, J.

At issue in this case is whether a lessee of real property may be held liable for environmental remediation costs and other damages resulting from gasoline discharges and spills from an underground storage tank that occurred during the time that the lessee occupied the premises. Plaintiff, the lessor, contends that he is entitled to recover those costs from defendant,[1] the lessee, based on theories of statutory strict liability and breach of contract. The trial court concluded that plaintiff is entitled to recover from defendant his remediation costs under the strict liability statute, but the court rejected plaintiff's claim for additional costs on his breach of contract theory. Defendant appeals, arguing that the trial court erred in applying the strict liability statute to him and in assessing all of the remediation costs against him. Plaintiff cross-appeals, arguing that the trial court should have awarded additional damages on his breach of contract claim. We affirm on the appeal and on the cross-appeal.

The trial court found the following facts, which the parties do not dispute on appeal. Plaintiff owns a parcel of land on which buildings and other improvements have been constructed for use by an automobile dealership. Plaintiff owned stock in an automobile dealership, which operated on the property until 1975.

In 1975, plaintiff sold his interest in the automobile dealership to defendant. At the same time, plaintiff leased the property to defendant for a term of 12 years. In 1979, the dealership purchased and had a contractor install a 5,000-gallon underground storage tank for gasoline. The tank came with an above-ground gasoline pump similar to those found at gasoline service stations. Neither the dealership nor defendant notified plaintiff of the installation of the tank and associated equipment. At some later time, however, plaintiff learned that defendant had installed the tank, and plaintiff did not demand that the equipment be removed.

---

[1] North Pacific Insurance Company, which insured the property for plaintiff, was also named as a defendant, but the claims against it were abated pending the final disposition of plaintiff's claims against the lessee, Weston. When we refer to "defendant," therefore, we mean Weston.

Shortly before the expiration of the agreement, in 1987, plaintiff entered into a new lease with a different automobile dealer, Ron Tonkin, to begin upon the expiration of defendant's lease. When the lease expired, defendant had the gasoline tank pumped of its contents and left the tank and associated piping in place.

Later in 1987, Tonkin decided to remove, or "decommission," the underground storage tank that the prior dealership had installed. Tonkin informed plaintiff of his intentions, and plaintiff gave permission to decommission the tank. Tonkin hired a contractor to perform the decommissioning work. The tank was removed in 1991. In removing the tank, the contractor discovered gasoline contamination at the tank site. Following a dispute over the costs of cleanup, plaintiff retained a different contractor to complete the remediation. Meanwhile, plaintiff demanded that defendant assume responsibility for the cleanup costs. Defendant refused. The remediation was completed to the satisfaction of the Department of Environmental Quality (DEQ). Although DEQ found a small quantity of remaining contamination, it declared that removal would not be required, because the contamination currently did not pose a threat to public health or the environment.

Plaintiff then initiated this action against defendant, alleging numerous claims, three of which ultimately were submitted to the trial court. First, plaintiff alleged that he was entitled to contribution for $62,112.79 in remediation costs under ORS 465.255(1)(a) and ORS 465.325(6)(a). The former statute provides, in part:

"The following persons shall be strictly liable for those remedial action costs incurred by the state or any other person that are attributable to or associated with a facility and for damages for injury to or destruction of any natural resources caused by a release:

"(a) Any owner or operator at or during the time of the acts or omissions that resulted in the release."

The latter statute provides:

"Any person may seek contribution from any other person who is liable or potentially liable under ORS 465.255.

In resolving contribution claims, the court shall allocate remedial action costs among liable parties in accordance with ORS 465.257."

ORS 465.257, in turn, identifies a variety of "equitable factors" to consider in allocating remediation costs. Second, plaintiff requested a declaration that defendant is liable for future remediation costs or for additional damages for the diminution in value that resulted from the contamination of his property. Third, he alleged that defendant is liable for those damages and attorney fees because the release constituted a breach of the lease in a number of particulars, including provisions relating to defendant's duty to comply with applicable laws, to avoid waste of the premises, to keep the premises in good repair and to hold plaintiff harmless for damages he incurs during the lease. Defendant denied liability and asserted numerous defenses and counterclaims. Those relevant to this appeal are defendant's contention that the strict liability statutes on which plaintiff's first claim is based do not apply, because they were enacted after his lease had expired. Defendant further contended that, even if the strict liability statutes apply, the action is time barred. Finally, defendant contended that if the statutes do apply, he is entitled to contribution from plaintiff and others for a proportional share of the remediation costs.

Following a bench trial, the trial court issued a detailed written opinion setting forth its findings and conclusions. On plaintiff's first claim, the court found as a matter of fact that defendant was an "operator" during the period of tank leakage and contamination that resulted, based on the evidence of the prior use of the tank and the location of the contamination in relation to the tank. The court concluded as a matter of law that ORS 465.255 applies retroactively to defendant and that defendant therefore is strictly liable for the costs of remediation. The court then allocated all of the remediation costs to defendant, with the following explanation:

"I find that [plaintiff], while liable under the statute, as the owner of the premises, for remedial action costs, equitably should not pay those costs. He did not install or authorize installation of the tank. He did not use the tank or benefit from its use. His only involvement, other than cleanup was

that he knew it had been installed and did not demand its removal. * * * Second, at the expiration of [defendant's] lease, [plaintiff], as was his right under the lease, claimed ownership of all installed fixtures. This necessarily included the tank. He did not insist on or permit its removal * * *. * * * I do not find this involvement to warrant imposing any part of the remedial action costs on [plaintiff]. He is entitled to contribution for the full $62,112.79."

The trial court denied defendant's affirmative defenses and counterclaims. It also denied plaintiff's second claim for relief, finding the cost of future remediation "speculative" and finding further that any "significant diminution of the value of the property is not established by the evidence." Finally, the court dismissed the third claim, finding that the release did not constitute a breach of the lease in any of the particulars alleged.

On appeal, defendant asserts three assignments of error: First, that the trial court erred in concluding that ORS 465.255 applies retroactively; second, that the trial court erred in rejecting his statute of limitations defense; and third, that the court erred in failing to allocate proportionally the remediation costs. We consider each of the assignments in turn.

■ Beginning with the first assignment of error, defendant argues that ORS 465.255 cannot be applied retroactively. According to defendant,

"[i]t is a general rule in Oregon that unless retroactive application is mandatory by the terms of the statute at issue, it should not be applied if such construction will impair existing rights, create new obligations or impose additional duties with respect to past transactions. * * * Oregon law establishes a presumption that statutes are applied prospectively, and will be applied retrospectively, only when such intent is absolutely spelled out. *Smith v. Clackamas County*, [252] Or 230, 233-24, 448 P2d 512 (1969). In *Smith*, the court concluded that the presumption against retroactive legislation should prevail and quoted authority that retroactive laws are characterized by want of notice and lack of knowledge of past conditions and that such laws disturb feelings of security in past transactions."

Plaintiff contends that the statute must be applied retroactively, because of its nature as a "remedial" statute and because the federal law from which ORS 465.255 was derived has been applied in that fashion.

■      In *Smith*, the court applied the rule that

"[a] substantive statute is presumed not to be retroactive, and such a statute will not be applied retroactively unless the language of the statute absolutely requires such application."

252 Or at 235. Defendant thus correctly describes the rule of that case. Both the rule and the case, however, have since been abandoned by the Oregon courts. Whether a statute applies prospectively or retroactively no longer is decided, in the first instance, by placing a label on the enactment and invoking a corresponding maxim of construction. The matter is determined by examining the statute and ascertaining the intentions of the legislature from the text, context and—if necessary—other aids to construction. *Ritcherson v. State of Oregon*, 131 Or App 183, 186, 884 P2d 554 (1994), *rev den* 320 Or 507 (1995). As the Supreme Court explained in *Whipple v. Howser*, 291 Or 475, 479-81, 632 P2d 782 (1981):

"In deciding the question presented for decision in this case [*i.e.*, whether a statute applies retroactively], it must first be kept in mind that when construing any statutory provision the duty of this court is to 'discern and declare the intent of the legislature.' *Fifth Ave. Corp. v. Washington County*, 282 Or 591, 596, 581 P2d 50 (1978); *see also* ORS 174.020.

"The starting point in every case involving a determination of legislative intent is the language of the statute itself. * * *

"* * * * *

"Sometimes, however, it is impossible to 'discern' the intent of the legislature regarding retroactivity or other matters from the language of the statute itself. For that reason, a number of 'rules' or 'maxims' of statutory construction have been developed to aid the courts in such cases in determining probable legislative intent as to whether a statute should be applied retroactively. We have

held, however, that such 'rules' or 'maxims' of statutory construction are not to be resorted to if the language of the statute itself expresses the intent of the legislature."

In so holding, the court addressed the continuing vitality of the traditional presumption against retroactivity and of the *Smith* decision that often had been cited for it:

"In holding as we do, we do not abandon the 'rules' or 'maxims' of statutory construction that have been developed for application in cases in which the court cannot otherwise 'discern and declare' the intention of the legislature and in which such 'rules' or 'maxims' may be of aid to the court in determining the probable intent of the legislature. We hold, however, that when * * * the language of a statute is sufficiently clear so as to reveal the legislature's intent, it is both unnecessary and improper to resort to such 'rules' or 'maxims' of statutory construction. Therefore, to the extent that *Smith v. Clackamas County, supra,* is inconsistent with our holding in this case that decision is overruled."

*Id.* at 487.

We begin our analysis, then, with the language of the statute. In so doing, we note that particular language "cues" have been recognized as especially relevant to a determination of a legislative intention to have a statute applied retroactively. The clearest of these is a plainly written retroactivity clause. *See, e.g., Volk v. America West Airlines,* 135 Or App 565, 568-69, 899 P2d 746 (1995), *rev den* 322 Or 645 (1996). Another common indicator of legislative intention is the tense in which the statute has been written. *See generally Martin v. City of Albany,* 320 Or 175, 181, 880 P2d 926 (1994) ("The use of a particular verb tense in a statute can be a significant indicator of the legislature's intention."). In that regard, our decision in *State ex rel Dwight v. Justice,* 16 Or App 336, 518 P2d 668 (1974), is especially instructive.

*Dwight* was a paternity proceeding in which the mother sought to establish that the defendant, rather than the man who at the time of conception in 1967 was her husband, was the father of her child. By the time of trial, some four years after conception, the legislature had enacted

amendments to the paternity statutes regarding the presumption of paternity:

> "The child of a wife cohabiting with her husband who was not impotent or sterile at the time of conception of the child shall be conclusively presumed to be the child of her husband * * *."

ORS 109.070(1) (1971). The mother argued that the amendments did not apply, because they were enacted after the conception of her child. We reached a contrary conclusion, principally on the basis of the phrasing of the amendments in the past tense:

> "A reading of the 1971 amendments set forth above shows that the legislature intended that such amendments should apply retrospectively because of the use of the past instead of the present tense of the verb in the phrase '*was* not impotent or sterile at the time of conception of the child * * *.' (Emphasis supplied.) In other words, had the legislature intended that these amendments should apply only prospectively, it would have used the present tense of the verb and said '*is* not impotent or sterile at the time of conception of the child * * *.' (Emphasis supplied.)"

*Dwight*, 16 Or App at 338-39.

Turning to the language of the statute at issue in this case, ORS 465.255 provides that, upon the moment that the act becomes effective, "[a]ny owner or operator at or during the time of the acts or omissions *that resulted* in the release" of hazardous materials shall be strictly liable "for remedial action costs *incurred*" by the state or any other person. (Emphasis supplied.) As in *Dwight*, if the legislature had intended the statute to apply prospectively only, it presumably would have used the present ("acts or omissions that *result* in the release") or the future conditional ("acts or omissions that *may result* in the release") tense.

Reference to the immediately surrounding text similarly reveals repeated reliance on the past tense, reflecting a concern for acts and omissions that already have occurred and remediation costs that already have been incurred by the time of enactment. For example, ORS 465.255(1)(b) includes in the list of strictly liable persons any owner or operator "who *became* the owner or operator after the time of the acts

or omissions that *resulted* in the release." (Emphasis supplied.) ORS 465.255(1)(c) adds to that list any owner or operator "who *obtained* actual knowledge of the release at the facility during the time the person was an owner or operator." (Emphasis supplied.) ORS 465.255(1)(d) similarly adds any person who "*caused, contributed to or exacerbated* the release," unless the acts or omissions of that person "*were* in material compliance" with applicable laws. (Emphasis supplied.) If those provisions were intended to have any effect upon enactment, it must be that they were intended to apply to events that occurred before enactment.

The retroactive character of the statute also is manifest from its stated purpose and its general structure. In its legislative findings, the legislature declared its concern with the "imminent and substantial threat to the public health, safety, welfare and the environment" posed by the release of hazardous substances into the environment. ORS 465.205-(1)(a). Consistent.with that statement of purpose, the legislature enacted companion provisions requiring DEQ to inventory sites of existing, as well as threatened, releases of hazardous substances, ORS 465.225, and to take action necessary to remedy the existing or threatened hazard. ORS 465.260(1). Clearly, the focus of the legislation extended to the dangers posed by existing, unremedied releases, as well as those not yet identified at the time of enactment. To hold otherwise would require us to assume that the legislature, after recognizing the "imminent and substantial threat" posed by releases of hazardous substances, did not intend its new legislation to extend to the remediation of hazards already in existence at the time of enactment. There is no evidence that the legislature had any such intentions.

It also bears noting that retroactive application of ORS 465.255 tracks federal court construction of the federal legislative counterpart, in conjunction with which Oregon's underground storage tank law expressly was intended to operate. ORS 465.210(2). *See generally Badger v. Paulson Investment Co., Inc.*, 311 Or 14, 21, 803 P2d 1178 (1991) ("In situations involving Oregon laws in large measure drawn from a federal counterpart, it is appropriate to look for guidance to federal court decisions interpreting similar federal

laws, even though those decisions do not bind us."). The federal Comprehensive Environmental Response, Compensation and Liability Act (CERCLA) provides for strict liability of the owner and operator of a facility and any other person "who at the time of disposal of any hazardous substance owned or operated any facility at which such hazardous substances were disposed of." 42 USC § 9607(a). Before the enactment of the Oregon statute, the federal courts had held that the strict liability provisions of that section apply retroactively.[2] *See, e.g., United States v. Northeastern Pharmaceutical*, 810 F2d 726, 732-33 (8th Cir 1986), *cert den* 484 US 848 (1987) ("it is manifestly clear that Congress intended CERCLA to have retroactive effect"); *Mayor and Bd. of Aldermen v. Drew Chemical Corp.*, 621 F Supp 663, 668 (DCNJ 1985) ("courts have universally held that CERCLA provides liability for acts within its scope but prior to its effective date"); *United States v. Ward*, 618 F Supp 884, 898 (DCNC 1985) ("by its very nature CERCLA is backward looking"); *United States v. Shell Oil Co.*, 605 F Supp 1064, 1072 (D Colo 1985) (same); *State ex rel Brown v. Georgeoff*, 562 F Supp 1300, 1314 (ND Ohio 1983) (same).[3]

We conclude from an analysis of the language of the statute in its context that the legislature intended ORS 465.255 to apply retroactively to releases that occurred before the effective date of the act.[4]

---

[2] We direct our attention to the state of federal law at the time of enactment, because the legislature could not have been aware of the state of subsequent law. The oft-cited presumption that legislatures are aware of the state of federal court construction of federal statutory counterparts to new state laws may be a dubious presumption. But, in cases such as this, when the legislature made explicit its awareness of the federal law and expressed its intention that the state and federal laws work in conjunction, it seems more likely that the legislature was aware of the state of the law at the time.

[3] The federal courts arrived at that conclusion by a variety of rationales. Some focused on the phrasing of the statute in the past tense. *See, e.g., Northeastern Pharmaceutical*, 810 F2d at 733. Others focused on the legislative history. *See, e.g., Ward*, 618 F Supp at 898; *Shell Oil*, 605 F Supp at 1073.

[4] Having reached our conclusion on the basis of the language of the statute, we need not address the parties' arguments on the import of the fragments of legislative history of ORS 465.255. *See Whipple*, 291 Or at 481; *see also PGE v. Bureau of Labor and Industries*, 317 Or 606, 610-12, 859 P2d 1143 (1993). In any event, none of the legislative history cited to us speaks directly to the issue at hand. Indeed, defendant's argument was that the legislative history of ORS 465.255, and of other similar statutes under consideration by the legislature during the same session, *did not* specifically mention retroactive applicability.

■ Defendant insists that, even if ORS 465.255 applies retroactively, he still is not liable in this case, because ORS 465.255(1)(d) provides a "safe harbor" for prior owners who acted "in material compliance with applicable laws, standards, regulations, licenses or permits." The language of the statute, however, does not support defendant's construction. ORS 465.255(1) provides:

"(1) The following persons shall be strictly liable for those remedial action costs incurred by the state or any other person * * *:

"(a) Any owner or operator at or during the time of the acts or omissions that resulted in the release.

"(b) Any owner or operator who became the owner or operator after the time of the acts or omissions that resulted in the release, and who knew or reasonably should have known of the release when the person first became the owner or operator.

"(c) Any owner or operator who obtained actual knowledge of the release at the facility during the time the person was the owner or operator of the facility and then subsequently transferred ownership or operation of the facility to another person without disclosing such knowledge.

"(d) Any person who, by any acts or omissions, caused, contributed to or exacerbated the release, unless the acts or omissions were in material compliance with applicable laws, standards, regulations, licenses or permits.

"(e) Any person who unlawfully hinders or delays entry to, investigation of or removal or remedial action at a facility."

It is readily apparent from the statute read as a whole that subsection (1)(d) is one of five separate categories of liable persons and that the proviso concerning compliance with applicable laws applies only to persons falling within that category, that is, persons other than owners or operators who caused the release, but who acted in material compliance with applicable laws. It is not, as defendant suggests, an exception to the liability that is imposed on owners and operators at or during the time of the release under subsection (1)(a). To read the statute as defendant suggests would have

the effect of vitiating the *strict* liability of owners and operators that subsection (1)(a) expressly imposes. Thus, ORS 465.255(1)(d) does not save defendant from strict liability under ORS 465.255(1)(a).

■ In his second assignment of error, defendant contends that the trial court erred in dismissing his affirmative defense based on ORS 12.135(1). That statute provides:

> "An action against a person, whether in contract, tort or otherwise, arising from such person having performed the construction, alteration or repair of any improvement to real property or the supervision or inspection thereof, or from such person having furnished the design, planning, surveying, architectural or engineering services for such improvement, shall be commenced within the applicable period of limitation otherwise established by law; but in any event such action shall be commenced within 10 years from substantial completion or abandonment of such construction, alteration or repair of the improvement to real property."

According to defendant, the tank installation is the event that gives rise to plaintiff's claims, and, because that installation was completed in 1979—more than ten years before the filing of the complaint in this action in 1992—plaintiff's claims are time barred. Plaintiff argues that ORS 12.135(1) does not apply to defendant, because he is not the person who "performed the construction, alteration or repair of any improvement to real property or the supervision or inspection thereof."

We agree with plaintiff. ORS 12.135(1) states a period of ultimate repose that applies to a person who performed specified tasks related to the improvement of real property. Defendant was not the person who installed the underground storage tank on plaintiff's property. Defendant hired a contractor to perform that work. Moreover, plaintiff's claims in this case do not arise out of the *installation* of the tank and associated equipment, but out of leaks from the tank and spillage of gasoline in the immediate area *after* installation. Thus, ORS 12.135(1) does not apply.

Defendant's third assignment contests the trial court's allocation of responsibility for the remediation of the

release. He offers three arguments in support of his assignment: First, that the trial court erred in not considering various equitable factors; second, that the trial court erred in failing to consider spreading responsibility among other individuals who were not parties to the action; and third, that the court erred in concluding that the most equitable allocation of responsibility was to assign all of the costs of remediation to defendant. Plaintiff responds that the court did consider all relevant factors; that the law does not permit spreading responsibility for remediation costs among nonliable parties; and that the trial court's allocation of total responsibility to defendant is justified entirely by defendant's relative degree of fault, his involvement in the release of the gasoline, plaintiff's lack of knowledge of the release and defendant's refusal to cooperate with plaintiff in cleaning up the release.

■   ORS 465.257 governs the allocation of responsibility for the costs of remedying a release of hazardous materials from an underground storage tank. It provides, in part:

"(1) Any person who is liable or potentially liable under ORS 465.255 may seek contribution from any other person who is liable or potentially liable under ORS 465.255. When such a claim for contribution is at trial and the court determines that apportionment of recoverable costs among the liable parties is appropriate, the share of the remedial action costs that is to be borne by each party shall be determined by the court, using such equitable factors as the court deems appropriate, including but not limited to the following:

"(a) The amount of hazardous substances contributed to the facility;

"(b) The degree of toxicity or hazard posed by the hazardous substances to public health, safety and welfare, and to the environment;

"(c) The degree of involvement in the release of the hazardous substance by the liable persons;

"(d) The relative culpability or negligence of the liable persons;

"(e) The degree of cooperation by the liable persons with the government or with persons who have a financial interest in the facility;

"(f)   The extent of the participation by the liable person in response actions at the facility;

"(g)   The length of time the facility was owned or operated by the liable person during the time the release occurred;

"(h)   Whether the acts or omissions that resulted in a release were in material compliance with applicable laws, standards, regulations, licenses or permits;

"(i)   The economic benefit derived from the facility or from the acts or omissions that resulted in a release;

"(j)   The circumstances and conditions involved in the facility's conveyance, including the price paid and any discounts granted; and

"(k)   The quality of evidence concerning liability and equitable shares."[5]

Contribution generally is an equitable remedy. *Rose City Transit Co. v. City of Portland,* 18 Or App 369, 425, 525 P2d 1325 (1974), *aff'd on other grounds* 271 Or 588 (1975). Accordingly, we review the trial court's decision *de novo.* ORS 19.125(3).

■       We begin with defendant's first argument, that the trial court failed to consider what he contends are all appropriate factors. Because we review *de novo,* whether the trial court considered all appropriate factors is beside the point. In any event, we conclude that the trial court's thorough and detailed opinion adequately considered all relevant factors.

■       Defendant's second argument requires little discussion, as well. According to defendant, the trial court should have allocated at least a portion of the responsibility for remediation costs to other persons who, although not parties to this action and not actually liable for such costs, are at

---

[5] The list of factors described in subsections (a) through (k) was added to the statute in 1995. They are taken nearly verbatim from a list of factors developed by federal courts for use in evaluating claims for contribution under CERCLA, based on the mention of such factors in the legislative history of the federal law. *See, e.g., Amoco Oil Co. v. Borden, Inc.,* 889 F2d 664, 672-73 (5th Cir 1989); *US v. Monsanto Co.,* 858 F2d 160, 168 n 13 (4th Cir 1988), *cert den* 490 US 1106 (1989). Interestingly, neither party suggests that the amendments do not apply retroactively; to the contrary, both plaintiff and defendant describe their positions with respect to this assignment in terms of the factors enumerated in the 1995 law.

least *potentially* liable. The statute simply does not say that. The first sentence of ORS 465.325(6) permits any person to seek contribution from any person who is "liable or potentially liable under ORS 465.255." The second sentence, however, says that the court actually may allocate remedial action costs "among *liable* parties." ORS 465.325(6) (emphasis supplied). Thus, under the terms of the statute, although either plaintiff or defendant could have sought contribution from other parties, the court could assign responsibility only to a party found to be liable. In this case, the trial court found only two parties to be liable: plaintiff and defendant. That finding of liability defined the universe of persons among whom the trial court could allocate responsibility for remediation costs under ORS 465.325(6).

■        We turn, then, to the allocation of those costs between plaintiff and defendant. In so doing, we find particularly relevant the statutory factors concerning the degree of involvement in the release, the degree of culpability of the parties, the degree of cooperation by the parties with the government or other persons involved in the cleanup, the length of time during which the parties owned the property compared with the time during which the release occurred and the extent to which the acts or omissions that resulted in the release were in compliance with applicable laws and regulations.

Plaintiff's role in the release was that of an absentee owner. He did not know of the installation of the tank; it was constructed without his knowledge or permission. He ultimately learned of the installation, but only some time after its completion. He derived no benefit from the tank. He never used it. The amount of the lease payments was in no way predicated on the presence of an underground storage tank. Nor did the presence of the tank enhance the future value of the lease property; Tonkin, in fact, began decommissioning the tank almost immediately upon the commencement of his lease. Plaintiff actively cooperated with DEQ in the remediation process and paid for the costs of the cleanup.

Defendant's role was very different. Defendant installed the tank and was the only one who benefited from its installation and use. The trial court found—and no one

assigns error to the finding—that the release took place entirely during defendant's lease term and that the release was caused, more particularly, by spillage from overfilling the tank, spillage from the fueling of the vehicles, leakage of the tank itself or a combination of those events. Thus, the acts and occurrences that resulted in the release were entirely on "defendant's watch." When plaintiff notified defendant of the release and demanded that defendant assume responsibility for the investigation and remediation, defendant refused, denying any responsibility.

Under the circumstances, we conclude that, taking into account the relevant statutory factors, it is appropriate to allocate all of the remediation costs to defendant and that the trial court therefore did not err in reaching the same conclusion.

On cross-appeal, plaintiff asserts four assignments of error: First, that the trial court erred in failing to hold that the release of hazardous material from the tank during defendant's lease constituted a breach of the lease; second, that the court erred in failing to award additional damages for the diminution in value or the future costs of removal of the remaining release; third, that the court erred in failing to award prejudgment interest; and fourth, that the court erred in failing to award plaintiff his attorney fees under the lease. In response, defendant contends that he did nothing that constituted a breach of the lease, that plaintiff failed to prove any diminution of value to the property resulting from the small remaining quantity of hazardous substances on site, that there is no basis for an award of prejudgment interest in this case and that, because defendant did not breach the lease, there is no basis for an award of attorney fees thereunder.

■ We begin with the first assignment on the cross-appeal, concerning the alleged breach of the lease. In reviewing the trial court's findings and conclusions concerning the lease claim, we review the court's construction of unambiguous lease provisions as a matter of law, *Housing Authority of Portland v. Martini,* 141 Or App 1, 4, 917 P2d 53 (1996), and review findings of fact for any evidence, *Illingworth v. Bushong,* 297 Or 675, 694, 688 P2d 379 (1984).

Plaintiff begins with the contention that defendant breached a lease provision requiring defendant

> "[t]o make no unlawful, improper or offensive use of [the] premises or any portion thereof, and during said term or any extension thereof, to comply with all statutes of the United States and/or all ordinances, rules, regulations and laws of other governmental authority regarding the maintenance, upkeep, operation and use of said premises and appliances therein * * *."

According to plaintiff, the release of gasoline on the premises constituted improper or offensive use and violated various statutes that were enacted after the term of defendant's lease ended. Plaintiff cites no authority for his argument. Defendant contends that plaintiff did not argue at trial that his use of the premises was "improper or offensive" and that he cannot raise that issue for the first time on appeal. He further contends that, "during said term or any extension thereof," nothing that occurred on the premises was unlawful, improper or offensive.

We agree with defendant that plaintiff failed to argue at trial that defendant's use of the premises was "improper or offensive" and do not address that argument on appeal. ORAP 5.45(2). As for the argument that defendant's conduct violated applicable laws that were enacted after the end of the lease, we likewise agree with defendant. It is true that the applicable laws apply retroactively. But the determinative question is not whether the laws apply retroactively; rather it is whether the parties intended the language of the lease that required defendant to comply with all laws "during said term or any extension thereof" to refer to laws not in effect during the time of the lease term. The language of the lease itself, with its qualification that the obligation to comply with all laws exists only during the term of the lease, strongly suggests that it was intended to apply only to laws in effect during the time of the lease. We note that the clause is a fairly common one, derived from a standard, preprinted lease form. Such clauses generally are not construed to apply to laws enacted after the execution of the lease. *See generally* Milton R. Friedman, *Friedman on Leases* § 11.1 at 761 (4th ed 1997) (clauses obligating tenants to comply with laws construed not to apply to laws enacted subsequent to execution

of lease and not contemplated at the time of execution); *see also, e.g., Bankers Trust Company v. Sommer*, 603 NYS2d 10, 10, 197 AD2d 490 (1993) (lease provision requiring tenant to comply with laws did not require tenant to comply with local law enacted years after execution of lease). We find no reason to construe the lease provision in this case to encompass laws enacted after the expiration of the lease.

■    Alternatively, plaintiff contends that defendant's conduct in allowing a release of gasoline breached a provision in the lease requiring defendant "[n]ot to commit or suffer any strip or waste of said premises." Plaintiff relies on *Lytle v. Payette-Oregon Irr. Dist.*, 175 Or 276, 152 P2d 934 (1944), in arguing that the release of a noxious substance that materially injures the rights of the lessor constitutes a waste. Defendant contends that no waste occurred in this case, because there is no evidence that the release of gasoline was the result of defendant's wrongful conduct.

     *Lytle* involved an infestation of weeds that occurred during a lessee's tenancy. The court did describe the infestation as a waste, but it also said that the lessee could be held liable only "[i]f the infestation of the land by weeds was the result of [the lessee's] mismanagement, judged by the standard of care and skill of a man of ordinary prudence." *Id.* at 288. In this case, the trial court did not find that defendant acted unreasonably under the circumstances. To the contrary, the trial court found that the release was a product of neither intentional wrongdoing nor negligence. Plaintiff does not assign error to those findings; his argument is that fault is not a prerequisite to liability for waste. As *Lytle* makes clear, that argument is incorrect.

■    Plaintiff argues that, in any event, defendant also breached a lease provision requiring him to keep the premises "in a good state of repair." Defendant replies that the trial court correctly concluded that the provision cannot apply to conditions about which he was unaware. Plaintiff, albeit without citation to authority, insists that knowledge and fault are irrelevant to defendant's liability under the lease provision.

■    We agree with defendant. As a general rule, a repair clause imposes liability only upon notice and an opportunity

to make repairs. *See, e.g., Bell v. Bernard Motors, Inc.*, 272 Or 413, 415, 537 P2d 86 (1975) (held not necessary to decide whether lease imposed upon landlord or tenant the obligation to repair, because there was no notice and opportunity to make repairs). In this case, the trial court found—and no one disputes—that, during the lease, defendant was unaware of a need to perform any repairs relating to the underground storage tank and its associated equipment. Defendant did not breach that provision of the lease.

■   Plaintiff asserts that defendant still breached a "hold harmless" provision in the lease, which contains the following language:

> "The Lessor shall in no event be liable for any accident or injury to any goods or person * * * caused by or aris[ing] out of the failure of the Lessee to observe any covenant, agreement or condition of this lease, or any statute or municipal ordinance, or which is caused by or arises out of any negligence on the part of any agent or employee of the Lessee * * * and the Lessor shall not be responsible or liable in any way for the injury or death of any person or damage to any property caused in or about the premises * * *. The Lessee does hereby jointly and severally covenant to save the Lessor harmless from any loss, damage or liability resulting from or arising out of any such accident or injury * * *."

Plaintiff asserts that the foregoing language is "broad enough to include plaintiff's claims." Defendant argues—and the trial court held—that the language refers solely to damages arising out of injuries to third parties or the property of third parties and that liability is based on the failure of the lessee to observe lease conditions or applicable laws or some other wrongdoing.

We agree with defendant. The lease expressly refers to accidents or injuries caused by or arising out of: (1) failure to observe a covenant or condition of the lease, (2) failure to comply with a law or ordinance, or (3) negligence on the part of the lessee, an employee or agent. As we already have concluded, the trial court correctly held that the release of gasoline on the lease premises did not result from a violation of any other lease provision, that plaintiff failed to demonstrate that the release violated any law or ordinance in effect at the

time and that the release did not result from defendant's negligence. Moreover, the reference to damage "to any property on or about the premises" does not apply to the premises themselves. The context of the phrase is injury or damage to third parties. In addition, damage to the premises themselves already is covered by other provisions in the lease. We conclude that the trial court correctly held that plaintiff failed to establish that defendant's conduct breached the lease in any of the particulars alleged.

■ In support of his second assignment on the cross-appeal, regarding the trial court's failure to award some amount of damages for diminution of value or the costs of future remediation, plaintiff contends that the trial court implicitly found that there were at least *some* damages and that the trial court committed reversible error in refusing to quantify those damages. Defendant contends that plaintiff misreads the trial court's decision, that the trial court simply declared that the claims for future damages and diminution of value failed as a matter of proof, and that the trial court's findings in that regard must be affirmed if the record contains any evidence to support them.

■ Again, we agree with defendant. A landowner may recover damages caused by a defendant's unlawful conduct, but the existence and amount of those damages must be established with reasonable certainty. *Sutherlin School Dist. # 130 v. Herrera*, 120 Or App 86, 92, 851 P2d 1171 (1993). If the trier of fact must resort to speculation, conjecture or surmise, a claim of damages will fail. *Id.* We review a trial court's findings as to damages for any evidence. *Id.* In this case, the trial court found that the cost of future remediation is speculative, and there is evidence to support that finding. As for the diminution of value claim, the trial court found that there was no evidence of "significant diminution" of value, and there is ample evidence to support that finding. Plaintiff's contention that, having found no "significant" diminution in value, the trial court was obligated to quantify the amount of the "insignificant" decrease reads too much into a single word of the trial court's findings. At trial, plaintiff contended that the value of the land was diminished by the cost of the future repairs. Because the repair estimates were speculative, there was no basis for determining any diminution in value. In that

context, it is clear that the trial court's finding, that "significant diminution of the value of the property is not established by the evidence," states a finding that plaintiff's diminution of value claim simply failed for evidentiary insufficiency. The trial court committed no error in declining to award damages either for future remediation costs or diminution of the value of the lease.

■    In support of his third assignment on the cross-appeal, concerning the trial court's failure to award prejudgment interest, plaintiff argues that the trial court should have awarded such interest, because the costs of remediation that already were incurred were readily ascertainable and were reasonable. Defendant counters that prejudgment interest is permitted only when a contract or a statute provides for it. Plaintiff responds that there simply is no such requirement in the law. Although neither party correctly characterizes the applicable law, we agree with defendant that the trial court committed no error in failing to award prejudgment interest in this case.

■■ As a general rule, prejudgment interest cannot be recovered in actions at law unless there is an agreement to pay interest or a statute imposing interest. *Dowling v. Albany Planing Mill*, 238 Or 425, 431, 395 P2d 143 (1964). If the obligation itself arises in equity, then prejudgment interest may be awarded in the sound discretion of the trial court. *Stephan v. Equitable S&L Assn.*, 268 Or 544, 573, 522 P2d 478 (1974). In contrast, when an equitable remedy is pursued, but the obligation itself does not arise in equity, the general rule applies. Thus, in a foreclosure action, in which the debt itself does not arise from equitable principles, prejudgment interest is not available in the absence of a contract or statute that provides for the award. *Mayer/Kleinknecht v. Bassett*, 263 Or 334, 348, 501 P2d 782 (1972).

In this case, although plaintiff seeks the equitable remedy of contribution, the obligation itself does not arise from equitable principles but from the application of a statute imposing strict liability for remediation costs. ORS 465.255(1)(a). Prejudgment interest, therefore, may be

awarded only if a contract or a statute provides for it. Plaintiff relies on no contract or statute for his claim for prejudgment interest. Consequently, he is not entitled to prejudgment interest in this case.

Finally, as to plaintiff's final assignment on the cross-appeal, in the light of our conclusion that the trial court correctly determined that defendant did not breach the lease, it necessarily follows that the court did not err in failing to award plaintiff attorney fees under the lease.

Affirmed on appeal and on cross-appeal.